1
2
3
4
5
6
7

8          UNITED STATES DISTRICT COURT

9     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MARY ELLEN LENNOX, *individually*          No.  2:21-cv-02075-DAD-CSK
     *and as successor in interest to decedent*
12   JORDAN ZENKA,

13                  Plaintiff,                   ORDER DENYING THE STATE
                                                 DEFENDANTS' MOTION FOR PARTIAL
14        v.                                     SUMMARY JUDGMENT AND GRANTING
                                                 IN PART AND DENYING IN PART THE
15   CITY OF SACRAMENTO, et al.,                 CITY DEFENDANTS' MOTION FOR
                                                 PARTIAL SUMMARY JUDGMENT
16                  Defendants.
                                                 (Doc. Nos. 44, 45)
17

18          This matter is before the court on two motions for partial summary judgment, one filed on

19   behalf of defendants City of Sacramento (the "City"), Michael Pinola, Travis Hunkapiller,

20   Ruvmin Tsverov,[1] Robert Lindner, Angel Espinoza, Joseph Swaleh, Jason Finnecum,[2] and John

21   Helmich (collectively, the "city defendants"), (Doc. No. 44), and the other filed by defendants

22   State of California (the "State"), by and through the California Highway Patrol, and Michael

23   Simpson (collectively, the "state defendants"), (Doc. No. 45).  On October 12, 2023, the pending

24   _____

25   [1]  This defendant's name has been spelled differently in the operative complaint and the parties'
     briefing.  The court will use the spelling as it appears in the operative complaint and on the docket
26   in this action.

27   [2]  Likewise, this defendant's name has also been spelled differently in the operative complaint
     and the parties' briefing.  Again, the court uses the spelling as it appears in the operative
28   complaint and on the docket in this action.

                                                 1

1 motions were taken under submission on the papers pursuant to Local Rule 230(g).  (Doc.

2 No. 54.)  For the reasons explained below, the court will grant in part and deny in part the city

3 defendants' motion for partial summary judgment, and it will deny the state defendants' motion

4 for partial summary judgment.

5 **BACKGROUND**

6       This case arises from the lethal shooting of Jordan Zenka ("decedent Zenka" or "the

7 decedent") by California Highway Patrol ("CHP") Officer Simpson and City of Sacramento

8 Police Department ("SPD") Officer Pinola and the less-lethal force[3] used on the decedent by SPD

---

10 [3]  The parties have used terms such as "less-lethal" force without clearly defining them.
11 However, according to California Penal Code § 16780(a):

12       "Less lethal weapon" means any device that is designed to or that has
      been converted to expel or propel less lethal ammunition by any
13       action, mechanism, or process for the purpose of incapacitating,
      immobilizing, or stunning a human being through the infliction of
14       any less than lethal impairment of physical condition, function, or
      senses, including physical pain or discomfort.  It is not necessary that
15       a weapon leave any lasting or permanent incapacitation, discomfort,
      pain, or other injury or disability in order to qualify as a less lethal
16       weapon.

17 The court presumes that this definition from the California Penal Code provides meaning to what
the parties intend to indicate in referring to "less-lethal" force.  As discussed in more detail
18 below, the force employed in this case included gunshots, "beanbag" rounds fired from "beanbag
shotguns," "40-millimeter" rounds fired from "40-millimeter launchers," and taser deployments.
19 The term "less-lethal" force encompasses all of these types of force, except for the gunshots,
which, of course, are categorized as "lethal" force.  Plaintiff explains that a "beanbag shotgun
20 deploys a lead shot contained in a cloth sack" and that it is "intended to induce compliance by
causing sudden, debilitating, localized pain."  (Doc. No. 48 at 17) (citations omitted).  However,
21 there is no explanation provided by the parties of what a 40-millimeter launcher is.  In other cases
where this term has been used, the parties have described this term as being a weapon that
22 launches less-lethal projectiles such as rubber bullets.  *See Felder v. Macias*, No. 2:20-cv-00266-
WBS-DMC, 2024 WL 3413561, at *4 (E.D. Cal. July 15, 2024) ("The 40 mm launcher is a
23 special-purpose firearm designed to launch 40 mm projectiles which are low velocity, less-lethal,
rubber rounds."); *Byrd v. Serrano*, No. 1:19-cv-01343-ADA-HBK, 2022 WL 11313955, at *6
24 (E.D. Cal. Oct. 19, 2022) ("The 40-millimeter launcher fires a direct-impact, less lethal sponge
round, an individual foam projectile designed to cause minimal injury."), *report and*
25 *recommendation adopted*, No. 1:19-cv-01343-ADA-HBK, 2022 WL 17598845 (E.D. Cal. Dec.
13, 2022); *Sims v. Zavala*, No. 16-cv-06779-JST, 2018 WL 11016208, at *2 (N.D. Cal. Mar. 26,
26 2018) ("As a control booth officer, Officer Zavala has access to both live ammunition and a 40-
millimeter launcher equipped with two types of 'less lethal' ammunition:  sponge rounds and
27 wooden-baton rounds.").

28

1   Officers Tsverov, Swaleh, Lindner, Espinoza, Finnecum, and Helmich under the supervision of

2   SPD Sergeant Hunkapiller on December 13, 2020.

3   **A.      Procedural History**

4          On August 26, 2021, plaintiff Mary Ellen Lennox, individually and as successor in

5   interest to decedent Zenka, filed a complaint in Sacramento County Superior Court initiating this

6   civil action against defendants.  (Doc. No. 1.)  Defendants removed the case to this federal court

7   on November 9, 2021 on the basis of federal question jurisdiction.  (*Id.*)  Plaintiff filed her second

8   amended complaint ("SAC") on May 27, 2022, asserting the following nine claims against one or

9   more of the defendants:  (1) a 42 U.S.C. § 1983 claim for use of excessive force in violation of

10   the Fourth Amendment brought against all named defendants, except the City and State; (2) a

11   § 1983 claim for deliberate indifference to serious medical needs brought against all named

12   defendants, except the City and State; (3) a § 1983 claim for a violation of substantive due

13   process under the Fourteenth Amendment brought against all named defendants, except the City

14   and State; (4) a § 1983 *Monell*[4] claim for an unconstitutional custom or policy brought against the

15   City and Does 9–10; (5) a § 1983 *Monell* claim for ratification brought against the City and Does

16   9–10; (6) a § 1983 *Monell* claim for failure to train brought against the City and Does 9–10; (7) a

17   state law battery (wrongful death and survival) claim brought against all defendants; (8) a state

18   law negligence (wrongful death and survival) claim brought against all defendants; and (9) a

19   claim under California Civil Code § 52.1 ("the California Bane Act") brought against all

20   defendants.[5]  (Doc. No. 21.)   On August 25, 2022, this case was reassigned to the undersigned.

21   (Doc. No. 28.)

22   ────────────────

[4] *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

23

24   [5]  Pursuant to the scheduling order as modified pursuant to the stipulation of the parties, discovery
     in this case closed on June 15, 2023.  (Doc. No. 42.)  To date, plaintiff has not identified Does 9–
25   10, who will therefore be dismissed from this action.  *See Entsminger v. Aranas*, No. 3:16-cv-
     00555-MMD-WGC, 2021 WL 4394773, at *3 (D. Nev. Sept. 24, 2021) ("Because discovery has
26   now closed and [the plaintiff] cannot provide the Doe Defendants' names, the Court finds that
     they should be dismissed without prejudice."); *Hernandez v. Cnty. of Riverside*, No. 20-cv-00676-
27   JGB-KK, 2021 WL 6496410, at *7 (C.D. Cal. Nov. 24, 2021) (dismissing the § 1983 claims
     brought against the Doe defendants because the discovery deadline had passed and the plaintiff
28   had not identified any Doe defendant).

1    On September 15, 2023, the city and state defendants filed their pending motions seeking

2    partial summary judgment in their favor.  (Doc. Nos. 44, 45.)  The city defendants move for

3    partial summary judgment as to all claims brought against them except claims two, four, and five,

4    and the state defendants move for summary judgment as to all claims brought against them except

5    claim two.[6]  (Doc. Nos. 44, 45.)  On September 29, 2023, plaintiff filed a joint opposition to those

6    motions for summary judgment, as well as exhibits in support of her opposition.  (Doc. No. 48.)

7    That same day, plaintiff separately lodged transcripts and video recordings, and filed responses to

8    defendants' statements of undisputed facts as well her own statement of additional material facts.

9    (Doc. Nos. 49, 50, 51.)  On October 10, 2023, defendants filed their replies to plaintiff's

10   opposition and responses to her statement of additional material facts.  (Doc. Nos. 52, 52-1, 53.)

11   As part of these filings, the city and state defendants filed objections to certain parts of plaintiff's

12   expert's declaration[7] (Doc. Nos. 52-1 at 66, 73–76; 53 at 12–16), and the city defendants also

13   filed objections to other portions of plaintiff's statement of additional material facts[8] (Doc. No.

14   52-1 at 38, 39, 55).

15   /////

16   /////

---

17
18   [6]  The city defendants have specified that they are not moving for summary judgment on claims
     two, four, and five brought against them because in their communication, plaintiff's counsel has
19   expressed a willingness to voluntarily dismiss those claims.  (Doc. No. 44-1 at 7–8.)  Similarly,
     the state defendants state in their pending motion that "[t]he parties reached an agreement that
20   Plaintiff will voluntarily dismiss her Second Claim for Relief for denial of medical care."  (Doc.
     No. 45-1 at 7 n.1.)  In her opposition to the pending motions, plaintiff did not address these
21   assertions by defendants.  (*See* Doc. No. 48.)  To date, no notice or stipulation requesting
     dismissal of any particular claims have been filed on the docket.  If plaintiff intends to dismiss
22   claims two, four, and five pursuant to an agreement between the parties, a stipulation doing so
     must be filed within twenty-one days of the docketing of this order.  However, if plaintiff does
23   not intend to dismiss those claims, plaintiff shall file a notice within twenty-one days of the
     docketing of this order stating that she intends to proceed on those claims.
24

25   [7]  The court does not rely on the objected-to portions of Roger Clark's expert's declaration in
     resolving the pending motions.  Accordingly, the court will overrule the city and state defendants'
26   evidentiary objections in this regard as moot.

27   [8]  Except where the court specifically overrules an objection for the reasons stated herein, the
     court does not rely on objected-to portions of plaintiff's statement of additional material facts;
28   objections to those facts are rendered moot.

1    **B.    Factual Background[9]**

2         On December 13, 2020, at approximately 6:35 a.m., the SPD received a call for service

3    that a subject, later identified as decedent Jordan Zenka, had crashed his automobile into the

4    exterior of the Bel-Air supermarket located on Arena Boulevard in the North Natomas section of

5    Sacramento.  (Doc. No. 21 at ¶ 28; CDUF at ¶ 1.)  Decedent Zenka thereafter entered the store

6    while screaming that someone was chasing him and trying to kill him.  (CDUF ¶ 2; SDUF ¶ 2.)

7    He proceeded to the bakery department, where he procured a serrated bread knife and sliced into

8    his own neck.  (CDUF ¶ 3; PSAFC ¶ 12; PSAFS ¶ 12.)  At approximately 6:44 a.m., SPD Officer

9    Gray arrived at the store.  (SDUF ¶ 4.)

10        Many of the events that occurred during the incident were captured to some extent on the

11   supermarket's designated PTZ #7 camera, without audio (Doc. No. 44-3, Exhibit 7, "PTZ-7"),[10]

12   and on the officers' body-worn cameras.  Officer Gray's body-worn camera (Doc. No. 47, "VG")

13   captured his interaction with decedent Zenka, with audio.  The timestamp on Officer Gray's

14   body-worn camera indicated that he radioed that an individual was cutting himself inside the

15   bakery at 6:44:33 a.m.  (VG at 00:36–00:53.)  Over the next minute and a half, Officer Gray

16   repeatedly told decedent Zenka, "Put down the knife," "You're fine," and "Relax."  (VG at

17   01:02–02:33.)  Decedent Zenka did not put the knife down.  (SDUF ¶ 4.)  About two minutes

18   after Officer Gray entered the store, decedent Zenka came out from behind the bakery counter

19   and started moving toward Officer Gray.  (SDUF ¶ 5; VG at 02:40–02:46.)  The body-worn

20   camera footage shows Officer Gray backing up as decedent Zenka is approaching him, with

---

21   [9]  This factual background is undisputed, except where otherwise noted, and is derived from the

22   undisputed facts as stated by the city defendants, as responded to by plaintiff and replied to by the
     city defendants (Doc. No. 52-1 at 2–18 ("CDUF")); the undisputed facts as stated by the state

23   defendants and responded to by plaintiff (Doc. No. 51 at 14–31 ("SDUF")); plaintiff's separate
     statement of additional material facts in opposition to the motions for summary judgment (Doc.

24   No. 51 at 32–70 ("PSAF")) as responded to by the city defendants (Doc. No. 52-1 at 18–77

25   ("PSAFC")) and as responded to by the state defendants (Doc. No. 53 at 5–12 "("PSAFS")); as
     well as the exhibits attached to the pending motions.

26
     [10]  The state defendants and plaintiff also submitted identical video footage (Doc. Nos. 47, 50) to

27   the PTZ #7 footage submitted by the city defendants, but the state defendants and plaintiff's
     submissions include additional video footage.  For simplicity, this order will only reference the

28   PTZ #7 footage submitted by the city defendants.

barriers in between them; during this interaction, it appears that Officer Gray always maintained a distance of at least thirty feet from decedent Zenka.  (VG at 02:40–02:50.)  Officer Gray radioed in, "he's charging me with a knife."  (VG at 02:43–02:45.)  A few seconds later, however, Gray radioed in, "he backed off."  (VG at 02:51–02:52.)  At around 6:47 a.m., a code-3 backup request was broadcasted, indicating that the subject was charging Officer Gray with a knife but that the subject had backed off a few seconds later.  (SDUF ¶ 6; CDUF ¶ 5; *see also* VG at 02:43–02:52.)  The body-worn camera footage shows that Officer Gray stopped in the self-check-out area of the store, and decedent Zenka stayed by the produce section, which is between the self-checkout area and the bakery.  (VG at 02:53.)  As additional officers began to arrive on the scene as backup, they congregated by the self-checkout stands of the store.  (CDUF ¶ 7; SDUF ¶ 7, 17; PSAFC ¶ 23.)

Decedent Zenka remained standing within a small area in the produce section of the store throughout the entire time the defendant officers were on scene until a group of officers approached him and employed force.  (PSAFC ¶ 43; PSAFS ¶ 43.)  Officer Gray's body-worn camera footage shows that from the time Officer Gray arrived until the defendant officers initiated their use of force, decedent Zenka was repeatedly told by officers to put down the bread knife he was holding.  (VG at 01:02–23:15.)  However, before using force, none of the officers on scene issued any warnings to decedent Zenka that they were about to use force upon him. (PSAFC ¶¶ 107, 108; PSAFS ¶¶ 107, 108.)  Officers are trained to give a warning before using less-lethal or deadly force when feasible.  (PSAFC ¶ 97, PSAFS ¶ 97.)

A review of the PTZ #7 video footage (PTZ-7 at 00:10–00:56) establishes that when force was employed on the decedent, there were over fifteen officers surrounding him with many of those officers aiming their weapons at him.  According to the Sacramento Police Department General Offense Report, six SPD officers deployed force, an additional ten SPD officers witnessed the incident, and an additional five SPD officers responded to the scene, for a total of twenty-one SPD officers at the scene.  (Doc. No. 44-3 at 141.)  Including defendant Simpson, who is a CHP officer, it thus appears that twenty-two officers in total were on the scene.

/////

6

The officers did not have any prior information about decedent Zenka's background, criminal history, or whether he was under the influence of drugs or alcohol.  (PSAFC ¶¶ 3, 4; PSAFS ¶¶ 3, 4.)  During the incident, decedent Zenka never verbally threatened to harm anyone, and he never injured anyone other than himself.  (PSAFC ¶¶ 5, 6; PSAFS ¶¶ 5, 6.)  At no point during the incident did he raise the bread knife above his head.  (PSAFC ¶ 9; PSAFS ¶ 9.)  Decedent Zenka did not have a gun.  (PSAFC ¶ 10; PSAFS ¶10.)  Defendants concede that the officers did not have any information that decedent Zenka was a fleeing felon who had committed a serious crime.  (PSAFC ¶ 126; PSAFS ¶ 126.)

The officers perceived decedent Zenka as experiencing a mental health crisis.  (PSAFC ¶ 1; PSAFS ¶1.)  Officers are trained to de-escalate situations when dealing with an individual experiencing a mental health crisis.  (PSAFC ¶ 100; PSAFS ¶ 100.)  Before officers used force, they saw decedent Zenka cutting himself with the knife and/or saw blood on his neck, indicating that he had already done so, and periodically saw him holding the bread knife against his neck or his arms.  (PSAFC ¶ 109; PSAFS ¶ 109.)

Upon his arrival, defendant Tsverov, a crisis negotiator with the SPD, took over verbal communications with decedent Zenka from Officer Gray but did not ask Gray what he had already talked to decedent Zenka about.  (CDUF ¶ 6; PSAFC ¶ 15; PSAFS ¶ 15.)  Officer Gray's body-worn camera shows defendant Tsverov taking over the communications with the decedent at approximately 7:00 a.m.  (VG at 16:15.)  As plaintiff points out, defendant Tsverov stopped attempting to de-escalate the situation through conversation approximately seven minutes later, or as the timestamp on Officer Gray's body-worn camera indicates, at 7:07:12 a.m., just before officers began approaching the decedent to use less-lethal force.  (CDUF ¶ 6; VG at 23:15.)

While still en route to the scene, SPD Captain defendant Hunkapiller, via radio communication, authorized officers to use "overwhelming less-lethal" force against decedent Zenka if he attempted to escape the store.  (PSAFC ¶ 16; PSAFS ¶ 16.)  Defendant Hunkapiller's body-worn camera (Doc. No. 50, "VH") captured the incident with audio, though the video of the recording is at times blocked by what seems to be a piece of fabric.  The timestamp on defendant Hunkapiller's body-worn camera shows his arrival at the grocery store at 7:03 a.m., at which time

he encountered employees gathered outside the door.  (VH at 06:32–07:03.)  Defendant

Hunkapiller instructed, "Hey, I want—Whoever is in charge of your employees, I want you all

back.  Away.  Everybody stage over there for me.  Thank you."  (*Id.* at 07:01–07:12.)  Although

the video is obstructed by the cloth covering his lens, it appears that defendant Hunkapiller

entered the store at 7:04 a.m., as indicated by the timestamp on his body-worn camera.  (*Id.* at

07:35.)

When defendant Hunkapiller arrived at the store, he assumed responsibility for

coordinating a response to the situation and immediately formulated a tactical plan pursuant to

which a "contact team" of some of the officers would approach decedent Zenka with shields and

use "overwhelming less-lethal" force to attempt to subdue him and take him into custody.

(PSAFC ¶¶ 20–21; PSAFS ¶¶ 20–21.)  At his deposition, defendant Hunkapiller testified that he

began creating a contact team to approach decedent Zenka because he knew the decedent "needed

medical attention" since he "was bleeding profusely," "was non-verbal," and "nonresponsive."

(Doc. No. 48-5 at 22–23.)

Defendant Pinola was part of a K-9 unit and had a police dog at the scene.  (PSAFC ¶ 14;

PSAFS ¶ 14.)  Under defendant Hunkapiller's plan, defendant Pinola was directed to deploy the

K-9 if decedent Zenka dropped the knife.  (SDUF ¶ 12.)  Defendant Simpson testified at his

deposition that it was his understanding that he was to provide lethal coverage for defendant

Pinola and the K-9.  (Doc. No. 48-3 at 10.)  However, Simpson also testified that he did not recall

any discussion that other officers would try to use less-lethal force, nor did he recall whether he

was aware that those officers were going to advance on the decedent.  (*Id.* at 10, 12.)

Certain officers who used less-lethal force against decedent Zenka—defendants Tsverov,

Lindner, Swaleh, and Espinoza—were not designated to be a part of the contact team assembled

by defendant Hunkapiller upon his arrival and were not directly informed about the plan.  (Doc.

Nos. 48-6 at 13 (defendant Tsverov testified at his deposition that he became aware of the

formation of a contact team by overhearing directions given to other officers); 48-7 at 13

(defendant Lindner testified at his deposition that nobody told him that there would be a contact

team that would approach decedent Zenka); 48-9 at 22–23 (defendant Swaleh testified at his

1  deposition that he was not aware that there was going to be an attempt to approach decedent

2  Zenka to try and use less-lethal force against him); 48-11 at 9, 19, 20 (defendant Espinoza

3  testified at his deposition that nobody told him what the tactical plan was; that he did not know

4  that the contact team was going to approach at the time that they did or that they were going to

5  fire; and that before he fired his less-lethal 40-millimeter launcher he had no communication with

6  defendant Hunkapiller at all.))

7          Defendants Simpson, Pinola, Lindner, Swaleh, Finnecum, and Helmich each testified that

8  they possessed tasers in their duty belts throughout the incident.  (PSAFC ¶ 28; PSAFS ¶ 28.)

9  The Taser 7, with which multiple officers on scene were equipped, has an effective range of about

10  twenty-one feet.  (PSAFC ¶ 31; PSAFS ¶ 31.)  Tasers can be effectively used against suspects

11  armed with knives from a distance to get them to drop the knife and take them into custody

12  without the use of deadly force.  (PSAFC ¶ 29; PSAFS ¶ 29.)  Nevertheless, defendant

13  Hunkapiller did not designate a taser officer as part of his tactical plan.  (PSAFC ¶ 27; PSAFS

14  ¶ 27.)  Although defendant Tsverov deployed a taser on the decedent, Tsverov testified that he

15  was not supposed to be part of the contact team.  (Doc. No. 48-6 at 13.)  Defendant Hunkapiller

16  was aware that tasers are generally an effective tool in incapacitating subjects.  (PSAFC ¶ 30;

17  PSAFS ¶ 30.)  While assembling the contact team, defendant Hunkapiller rejected an officer's

18  offer to provide a long-distance taser, responding, "I just want beanbags and 40s."  (PSAFC ¶ 40;

19  PSAFS ¶ 40.)

20          Many of the defendant officers were aware that a suspect might flee when subjected to

21  less-lethal weapons being fired at them, with some even predicting that decedent Zenka might

22  run.  (PSAFC ¶¶ 44, 46; PSAFS ¶¶ 44, 46.)  For example, defendant Simpson testified at his

23  deposition that in his experience, he had seen a suspect run when being shot at by less-lethal

24  weapons.  (Doc. No. 48-3 at 28.)  Simpson also testified that he moved forward to prevent

25  decedent Zenka's escape.  (*Id.* at 33.)  Similarly, defendant Pinola testified at his deposition that

26  he believed that if less-lethal weapons were being fired, decedent Zenka might run out the

27  supermarket's exit door and that he positioned himself in a way to try to block him from doing so.

28  (Doc. No. 48-4 at 26.)

In Officer Gray's body-worn camera footage, defendant Hunkapiller can be seen communicating the tactical plan at 7:06:00 AM, just two minutes after entering the supermarket. (VG at 22:00–22:22.)  The parties agree that defendant Hunkapiller gave the contact team the order to advance toward decedent Zenka less than four minutes after Hunkapiller arrived on the scene. (PSAFC ¶ 55; PSAFS ¶ 55.)  Defendant Hunkapiller did not ask any officer what had occurred up until that point with respect to their efforts to speak to decedent Zenka or to de-escalate the situation, whether any tactic had proven effective in talking to decedent Zenka, whether decedent Zenka had spoken to officers at all, or what decedent Zenka's demeanor had been since officers made contact with him. (PSAFC ¶ 24; PSAFS ¶ 24.)  Defendants acknowledged that, at the time defendant Hunkapiller gave the contact team the order to advance on him, decedent Zenka did not appear to officers to pose an immediate threat of death or serious bodily harm to anyone else and that it would not have been appropriate to use deadly force upon him at that time. (PSAFC ¶ 104; PSAFS ¶ 104.)

The timestamp on Officer Gray's body-worn camera indicates that the contact team began advancing toward decedent Zenka at 7:07:18 a.m., and the footage shows officers using less-lethal force on the decedent a few seconds later. (VG at 23:21–23:31.)  The approach took place approximately twenty minutes after Officer Gray had radioed, "he's charging me with a knife." (VG at 02:43–02:45.)  As the contact team advanced, defendants Simpson and Pinola began moving forward, closer to decedent Zenka and blocking off his potential path to the supermarket doors, despite nobody having told them to do so. (PSAFC ¶ 56; PSAFS ¶ 56.)  Immediately after the contact team began its advance, less-lethal weapons were being fired at decedent Zenka both from the east of him,[11] including by members of the contact team, and from the south of him by

---

[11]  Plaintiff characterizes this fact as follows:  "Immediately after the contact team began its advance, less-lethal weapons were being fired at Zenka both from the west of him, including by members of the contact team, as well as from the south of him by other officers who were advancing up the store aisles." (PSAF ¶ 57.)  In support of this fact, plaintiff cites to defendant Pinola's deposition, where Pinola testified that it was his impression that "less-lethal was coming from the officers on the further south in the store and also the group to [Officer Pinola's] left that was approaching in a west direction[.]" (Doc. No. 48-4 at 28–29.)  Considering that officers approaching in a west direction would actually be coming from the east, the court has adjusted the phrasing of this fact for purposes of summary judgment accordingly.

10

1  other officers advancing up the store aisles.  (PSAFC ¶ 57; PSAFS ¶ 57.)  Defendant Finnecum

2  fired four beanbag rounds, defendant Swaleh fired one beanbag round, and defendants Espinoza

3  and Lindner each fired one less-lethal 40-millimeter ("40mm") round.  (PSAFC ¶ 57; PSAFS

4  ¶ 57.)  Many of the less-lethal rounds struck decedent Zenka all over his body.  (PSAFC ¶ 62;

5  PSAFS ¶ 62.)  Plaintiff's police practices expert, Roger Clark, opined that "[r]ather than using

6  overwhelming less-lethal force prior to the shooting such as the bean bags and 40mm launchers,

7  the officers should have utilized tasers, including taser officers in the contact team and tasing Mr.

8  Zenka upon their initial approach."  (Doc. No. 48-1 at 7.)

9      After the contact team advanced toward decedent Zenka and officers began firing less-

10  lethal weapons at him, the decedent began moving quickly northward toward a wall inside the

11  supermarket that ran west to east.  (PSAFC ¶ 58; PSAFS ¶ 58.)  By moving northward toward the

12  wall, decedent Zenka was moving directly away from the officers approaching him from the

13  south.  (PSAFC ¶ 59; PSAFS ¶ 59.)  Upon reaching the west-east wall to the north, defendant

14  Zenka turned right and moved eastward along the wall until he reached a corner, where another

15  wall ran north from that corner toward the exit doors of the supermarket.  (PSAFC ¶ 60; PSAFS

16  ¶ 60.)  Defendant Tsverov deployed his taser and struck decedent Zenka as the decedent neared

17  the corner, discharging the taser for five seconds.  (PSAFC ¶ 65; PSAFS ¶ 65; *see also* PTZ-7 at

18  00:10–00:16.)

19      At essentially the same time or immediately after, defendant Simpson fired six gunshots

20  with lethal ammunition at decedent Zenka, and defendant Pinola fired four gunshots with lethal

21  ammunition at the decedent as he reached the corner of the wall.  (PSAFC ¶ 73; PSAFS ¶ 73;

22  PTZ-7 at 00:10–00:16; Doc. Nos. 48-3 at 20; 48-4 at 9.)  A total of seven of those gunshots struck

23  the decedent.  (PSAFC ¶ 74; PSAFS ¶ 74.)  The court is unable to determine from the video

24  evidence submitted on summary judgment whether the decedent was shot or tased first, but does

25  observe that the taser and gunshots were discharged in rapid succession, nearly simultaneously or

26  mere seconds apart.  (*See* PTZ-7 at 00:12–00:14.)

27      The city defendants assert that, before the lethal shooting, decedent Zenka darted toward

28  the exit, heading in the direction of defendant Pinola.  (CDUF ¶ 12.)  Plaintiff disputes this,

arguing that the video evidence shows decedent Zenka turning left as he approached the corner, seemingly attempting to pass between defendant Pinola and a display case in order to escape the store without directly approaching any officer. (*Id.*) The PTZ #7 video before the court shows that decedent Zenka shuffled toward defendants Pinola and Simpson, with his side facing Pinola and Simpson and his chest turned in the direction of the exit door. (PTZ-7 at 00:08–00:13.) It is clear from a review of the PTZ #7 video that the decedent would not have been able to pass through the exit doors without moving toward Pinola and Simpson. (*Id.*) The video footage shows that the shooting occurred while the decedent was shuffling in the direction of Pinola and Simpson before reaching the corner where the walls intersected and that the decedent had not yet turned the corner left when he was shot. (*Id.*)

The city defendants agree with plaintiff that at the time decedent Zenka began moving eastward along the wall until the time defendants Pinola and Simpson shot him, the decedent was holding the knife with the handle approximately at the level of his navel and with the blade pointed downward. (PSAFC ¶ 61.) However, the state defendants dispute this, noting that while it is undisputed that defendant Simpson testified at his deposition that the knife blade was pointed down, the surveillance video shows decedent Zenka holding the knife in such a way that the blade was facing toward defendants Simpson and Pinola. (PSAFS ¶ 61.) However, the court's own review of the surveillance video evidence before it reflects that the knife remained at decedent Zenka's navel level, parallel to the ground, but that the direction in which the blade was facing is unclear. (PTZ-7 at 00:08–00:12.)

Perhaps most importantly for purposes of resolving the pending motions, the parties purport to dispute a key fact: whether decedent Zenka was within striking distance of defendants Pinola and Simpson when they fired their lethal shots. Based, in part, on defendant Pinola's body-worn camera footage (Doc. No. 50, "VP"), plaintiff estimates that decedent Zenka was at least ten to fifteen feet away from defendants Pinola and Simpson at that time. (PSAF ¶ 72.) The city defendants estimate that decedent Zenka came within seven to eight feet of defendant Pinola just prior to lethal force being deployed, based on defendant Pinola's deposition testimony and the PTZ #7 video footage. (PSAFC ¶ 72; *see also* Doc. No. 48-4 at 27 (defendant Pinola testified

1    at his deposition that decedent Zenka was seven to eight feet away right before the shooting.))

2    The state defendants estimate that decedent Zenka was within eight to ten feet of Simpson when

3    Simpson fired his shots, based on defendant Simpson's deposition testimony.  (PSAFS ¶ 72; *see*

4    *also* Doc. Nos. 48-3 at 8 (defendant Simpson testified at deposition that he was eight to ten feet

5    from Zenka at the time he fired his last shot.))  From its own review of Pinola's body-worn

6    camera footage and the PTZ #7 video, the court estimates that decedent Zenka was approximately

7    ten to fifteen feet from Simpson and Pinola at the time the lethal shots were fired, though it is

8    admittedly difficult to identify the distances precisely from the video evidence alone.  (VP at

9    21:28–21:33; PTZ-7 at 00:12–00:13.)

10         The parties agree that decedent Zenka fell to the floor, but they dispute whether it was the

11   taser or the gunshots that caused him to fall.  (CDUF ¶ 14; PSAFC ¶ 66; PSAFS ¶ 66.)  Plaintiff

12   contends that the taser induced the decedent's fall, citing various evidence, including the

13   deposition of Greg Meyer, the defense's police practices expert.  At deposition, Mr. Meyer

14   testified that decedent Zenka "was still running until he was hit with that Taser shot which

15   immediately caused him to do a classic Taser fall."  (Doc. No. 48-12 at 43.)  Mr. Meyer further

16   opined that even if no lethal rounds had been discharged, decedent Zenka would have fallen to the

17   ground from the taser alone.  (*Id.* at 43–44; *see also* PSAFC ¶ 67; PSAFS ¶ 67.)[12]  On the other

18   hand, the city and state defendants cite the PTZ #7 video to support their argument that the

19   gunshots induced the decedent's fall.  (PSAFC ¶ 66; PSAFS ¶ 66.)  The state defendants assert

20   that the video illustrates defendants Pinola and Simpson discharging their weapons before the

21   decedent's body tenses as he falls.  (PSAFS ¶ 66.)  Meanwhile, the city defendants argue that, in

22   the PTZ #7 video, defendant Pinola's first muzzle flash is visible at thirteen seconds, and

23

---

24   [12]  The city defendants object to this portion of their own expert's deposition testimony as
     "conjecture and speculation."  (PSAFC ¶ 67.)  The court recognizes that "[m]ere allegation and
25   speculation do not create a factual dispute for purposes of summary judgment."  *Nelson v. Pima
     Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996).  However, the city defendants do not explain
26   why or in what way this testimony is speculative.  *See Est. of McNeil ex rel. Berkes v.
     FreestyleMX.com, Inc.*, No. 13-cv-02703-NLS-KSC, 2015 WL 13567073, at *5 (S.D. Cal. Feb. 9,
27   2015) (stating that "the affidavit of an expert cannot be disregarded as merely speculative").  As
     such, the city defendants' objection in this regard is overruled.
28

defendant Tsverov's taser prongs are seen after fourteen seconds.  (PSAFC ¶ 66.)  As noted above, from observing the PTZ #7 video, the court cannot determine whether the decedent was shot or tased first, nor can the court discern which action caused him to fall, or if both actions contributed to his fall.  (*See* PTZ-7 at 00:08–00:14.)

When decedent Zenka was on the ground after the shooting, officers could tell that he had been shot.  (PSAFC ¶ 80; PSAFS ¶ 80.)  Nonetheless, defendant Hunkapiller instructed officers to use additional less-lethal force against the decedent at that time.  (PSAFC ¶ 81; PSAFS ¶ 81.)  Defendant Tsverov deployed his taser against decedent Zenka for two additional five-second cycles.  (PSAFC ¶ 82; PSAFS ¶ 82.)  Defendants Lindner and Helmich each fired another round with their 40mm launchers.[13]  (PSAFC ¶ 85; PSAFS ¶ 85.)  The parties agree that the purpose of this use of force was to attempt to disarm decedent Zenka, who was still holding the bread knife in his hand.  (PSAFC ¶ 86; PSAFS ¶ 86; *see also* PTZ-7 at 00:14 –00:42.)  In response to this force, decedent Zenka eventually dropped the knife.  (PTZ-7 at 00:40–00:43.)  Officers then handcuffed the decedent and began administering medical aid to him.  (CDUF ¶ 16.)

Decedent Zenka died as a result of his wounds.  (CDUF ¶ 17.)[14]

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party

---

[13]  In their moving papers, the parties did not include as an undisputed fact that defendant Helmich fired a first round with his 40mm launcher.  However, this is implied because it is undisputed by the parties that "Officers Lindner and Helmich each fired a *second* round with their 40-millimeter launchers after Zenka had been shot and was lying on the ground."  (PSAFC ¶ 85; PSAFS ¶ 85) (emphasis added).

[14]  The supporting evidence for this fact is the deposition of defendant Tsverov, who testifies that fire personnel declared decedent Zenka dead at the scene.  (Doc. No. 44-3 at 126.)

1    may accomplish this by "citing to particular parts of materials in the record, including

2    depositions, documents, electronically stored information, affidavits or declarations, stipulations

3    (including those made for purposes of the motion only), admissions, interrogatory answers, or

4    other materials," or by showing that such materials "do not establish the absence or presence of a

5    genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

6    Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at trial,

7    "the moving party need only prove that there is an absence of evidence to support the non-moving

8    party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R.

9    Civ. P. 56(c)(1)(B).  Indeed, after adequate time for discovery and upon motion, summary

10   judgment should be entered against a party who fails to make a showing sufficient to establish the

11   existence of an element essential to that party's case, and on which that party will bear the burden

12   of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an

13   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

14   *Id.* at 322–23.  In such a circumstance, summary judgment should be granted, "so long as

15   whatever is before the district court demonstrates that the standard for the entry of summary

16   judgment . . . is satisfied."  *Id.* at 323.

17        If the moving party meets its initial responsibility, the burden then shifts to the opposing

18   party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita*

19   *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the

20   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

21   of its pleadings but is required to tender evidence of specific facts in the form of affidavits or

22   admissible discovery material in support of its contention that the dispute exists.  *See* Fed. R. Civ.

23   P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773

24   (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for

25   summary judgment.").  The opposing party must demonstrate that the fact in contention is

26   material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the

27   dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

28   non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011); *see also Ambat v. City & Cnty. of San Francisco*, 757 F.3d 1017, 1023 (9th Cir. 2014) ("[W]e are governed by the same principles as the district court:  whether, with the evidence viewed in the light most favorable to the non-moving party, there are no genuine issues of material fact, so that the moving party is entitled to a judgment as a matter of law.") (quoting *San Diego Police Officers' Ass'n v. San Diego City Emp. Ret. Sys.*, 568 F.3d 725, 733 (9th Cir. 2009)).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586–87 (citations omitted).

## ANALYSIS

### A.      Federal Claims

Defendants move for summary judgment as to plaintiff's federal claims brought against the defendant officers under 42 U.S.C. § 1983 for use of excessive force in violation of the Fourth Amendment, as well as for violating the Due Process Clause of the Fourteenth Amendment.  (Doc. Nos. 44-1, 45-1.)  In addition, the City moves for summary judgment in its favor on plaintiff's § 1983 *Monell* claim for failure to train.  (Doc. No. 44-1.)

1    Under § 1983, a private right of action exists against anyone who, "under color of" state

2    law, causes a person to be subjected "to the deprivation of any rights, privileges, or immunities

3    secured by the Constitution and laws . . . ." 42 U.S.C. § 1983. "Section 1983 does not create

4    substantive rights; it merely serves as the procedural device for enforcing substantive provisions

5    of the Constitution and federal statutes." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991)

6    (citing *Chapman v. Hous. Welfare Rts. Org.*, 441 U.S. 600, 617 (1979)).

7    State officials are entitled to qualified immunity from a § 1983 suit unless "(1) they

8    violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was

9    'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)

10    (quoting *Reichel v. Howards*, 566 U.S. 658, 664 (2012)).

11    1.    <u>Fourth Amendment Excessive Use of Force Claim:  Individual Liability</u>[15]

12    Defendants move for summary judgment in their favor as to plaintiff's § 1983 excessive

13    use of force claim, in which plaintiff alleges that defendants violated the Fourth Amendment by

14    shooting decedent Zenka. (Doc. Nos. 44-1, 45-1.) Defendants contend that, based on the

15    undisputed evidence before the court on summary judgment, the defendant officers' use of force

16    was objectively reasonable under the circumstance. (Doc. Nos. 44-1 at 8; 45-1 at 7.)

17    Furthermore, defendants argue that they are entitled to judgment in their favor on qualified

18    immunity grounds. (Doc. Nos. 44-1 at 12–14; 45-1 at 19.) Because defendants' argument that

19    the defendant officers' conduct was "objectively reasonable" is part of the qualified immunity

20    analysis, the court will not address that argument separately below.

21    Plaintiff's § 1983 claim for the excessive use of force in violation of the Fourth

22    Amendment is governed by an "objective reasonableness standard." *Graham v. Connor*, 490

23    U.S. 386, 388 (1989) (internal quotation marks omitted). The reasonableness of a particular use

24    of force is determined through a three-step inquiry, which is known as the *Graham* analysis. *See*

25    *id.* First, a court "must assess the severity of the intrusion on the individual's Fourth Amendment

26    rights by evaluating 'the type and amount of force inflicted.'" *Espinosa v. City & Cnty. of San*

27

28    ---
     [15] The court will analyze the city defendants' motion for summary judgment with respect to
     defendant Hunkapiller separately below.

*Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (quoting *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).  "[E]ven where some force is justified, the amount actually used may be excessive."  *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).  The second step is to determine the government's countervailing interests in applying force.  *Graham*, 490 U.S. at 396.  Finally, a court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion."  *Miller*, 340 F.3d at 964.

The calculus "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396–97.  Reasonableness in this context is to be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396.

"[T]he reasonableness of force used is ordinarily a question of fact for the jury."  *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997).  Indeed, the Ninth Circuit has repeatedly recognized that "summary judgment should be granted sparingly in excessive force cases."  *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014); *see also Seidner v. de Vries,* 39 F.4th 591, 601 (9th Cir. 2022); *Santos*, 287 F.3d at 853 ("Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.").  Thus, while it is true that officers "are often forced to make split-second judgments," "it is equally true that even where some force is justified, the amount actually used may be excessive."  *Santos*, 287 F.3d at 853 (citations omitted).  In the final analysis, "[f]orce is excessive when it is greater than is reasonable under the circumstances."  *Id.* at 854 (citing *Graham*, 490 U.S. at 395).

a.    *Nature and Quality of the Intrusion*

The court's *Graham* analysis begins with an assessment of "the quantum of force used."  *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1279–80 (9th Cir. 2001)).

/////

18

1    Regarding defendant Tsverov's deployment of a taser on decedent Zenka, it is well-

2    established that the use of a taser in dart mode[16] constitutes "an intermediate, significant level of

3    force that must be justified by the governmental interest involved." *Bryan v. MacPherson*, 630

4    F.3d 805, 826 (9th Cir. 2010); *Mattos v. Agarano*, 661 F.3d 433, 449 (9th Cir. 2011) (quoting

5    *Bryan*, 630 F.3d at 826); *see also Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091 (9th Cir.

6    2013) ("Here, the intrusion on [the plaintiff's] Fourth Amendment interests—the discharge of a

7    taser in dart mode upon him—involved an intermediate level of force with 'physiological effects,

8    [ ] high levels of pain, and foreseeable risk of physical injury.'") (quoting *Bryan*, 630 F.3d at

9    825); *Aguilar v. Knueppel*, No. 23-15442, 2024 WL 1300000, at *1 (9th Cir. Mar. 27, 2024)[17]

10   ("We have previously held that the use of a taser in dart mode constitutes 'an intermediate,

11   significant level of force.'") (quoting *Bryan*, 630 F.3d at 826).

12   The court next turns to the deployment of beanbags by defendants Finnecum and Swaleh

13   and 40mms by defendants Lindner, Espinoza, and Helmich.  The use of a less-lethal beanbag

14   shotgun or the 40mm less-lethal launcher is a significant use of force "which has the capability of

15   causing serious injury."  *Deorle*, 272 F.3d at 1280 (explaining that "the cloth-cased shot

16   constitutes force which has the capability of causing serious injury, and in some instances does

17   so"); *see also Glenn v. Washington Cnty.*, 673 F.3d 864, 873 (9th Cir. 2011) ("Although bean bag

18   guns are not designed to cause serious injury or death, a bean bag gun is considered a 'less-lethal'

19   weapon, as opposed to a non-lethal weapon, because the bean bags can cause serious injury or

20   death" "if they hit a relatively sensitive area of the body, such as [the] eyes, throat, temple or

21   groin."); *Washington v. City of Los Angeles*, No. 17-cv-02829-PA-FFM, 2018 WL 6131603, at *5

22

23   [16]  The parties did not specify what mode defendant Tsverov used with his taser.  However, the
     court presumes that the taser was used in dart mode, because from observing defendant Tsverov's
24   body-camera footage, it is apparent that defendant Tsverov did not apply the taser directly to
     decedent Zenka's body.  (VT at 14:57–15:29); *see Dormaier v. City of Soap Lake*, No. 2:19-cv-
25   00354-SAB, 2020 WL 6687356, at *5 n.2 (E.D. Wash. Nov. 12, 2020) ("Tasers generally have
     two modes: drive-stun, wherein the taser is pressed against a person's body, and dart mode,
26   wherein aluminum darts attached to the taser by wires spring out and attach to a person's body.").

27   [17]  Citation to unpublished Ninth Circuit opinions such as this and those throughout this order is
28   appropriate pursuant to Ninth Circuit Rule 36-3(b).

(C.D. Cal. Apr. 16, 2018) ("[T]he Court acknowledges that the use of the 40 mm less lethal launcher and foam projectile, like the use of a beanbag shotgun, is a significant use of force 'which has the capability of causing serious injury.'") (citation omitted), *aff'd*, 791 F. App'x 683 (9th Cir. 2020).

Finally, the court examines the gunshots fired by defendants Simpson and Pinola. Plaintiff contends that "[b]ecause the shots fired by Simpson and Pinola constitute the greatest possible amount of force, they require the highest justification." (Doc. No. 48 at 19.)  Indeed, the Ninth Circuit has recognized that "[t]he use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'"  *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)).  In other words, the "nature and quality" of the intrusion on decedent Zenka's Fourth Amendment interests by defendants Pinola and Simpson was extreme.  *Garner*, 471 U.S. at 8; *see also A.K.H. ex rel. Landeros*, 837 F.3d at 1011 (stating that "[t]he 'nature and quality of the intrusion' by [the officer] on [the decedent's] Fourth Amendment interests was extreme" in using deadly force) (citation omitted).

b.    *Government's Interest in the Use of Force*

Now, the court turns to the government's interest in the use of force.  Relevant factors in evaluating the state's interests include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  "These factors, however, are not exclusive."  *Bryan*, 630 F.3d at 826.

i.    Severity of the Crime

First, the court considers "the severity of the crime at issue."  *Graham*, 490 U.S. at 396. The parties disagree about whether the officers responded to a serious crime.  The state defendants argue that the defendant officers responded to a broadcast that decedent Zenka charged Officer Gray with a knife, arguing that this constitutes an assault under California law,

20

California Penal Code § 241(c).  (Doc. No. 45-1 at 13.)  Similarly, the city defendants highlight the undisputed fact that decedent Zenka was armed with a knife.  (Doc. No. 52 at 2.)  Conversely, plaintiff argues that officers were responding to a mental health crisis, and emphasizes that decedent Zenka had not harmed anyone, made verbal threats, or committed any violent offense against others, but had only inflicted wounds to his own neck.  (Doc. No. 48 at 16.)  Plaintiff further argues that the defendant officers, aware only of a serrated bread knife in decedent Zenka's possession, lacked any reason to suspect that he had a gun or other weapons.  (*Id.*)

The defendant officers received a broadcast that the subject had charged an officer with a knife, but they immediately thereafter received another broadcast that the subject had backed off.  Furthermore, there was no indication whatsoever that the officer had actually been assaulted.

Even if the broadcast of decedent Zenka charging at Officer Gray with a knife could provide a reasonable basis to believe that a crime had been committed, approximately twenty minutes had elapsed between the incident and when officers approached decedent to use "overwhelming less-lethal force" against him.  It is undisputed that decedent Zenka did not appear to officers to pose an immediate threat when the contact team began their approach.  Since decedent Zenka was not assaulting officers or anyone else at the time officers approached, this factor weighs in plaintiff's favor with respect to the initial use of force.  *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019) (reversing grant of summary judgment in a deadly force case where "[e]ven if" the decedent had threatened someone with a knife "prior to [the officer's] arrival, he was indisputably not engaged in any such conduct when [the officer] arrived, let alone when [the officer] fired his weapon"); *Sweet v. City of Mesa*, No. 17-cv-00152-PHX-GMS, 2022 WL 363999, at *6 (D. Ariz. Feb. 4, 2022) ("Between the report and the confrontation, [a hotel employee] reported to the officers that she saw the weapon in the room, but did not tell them any other details.  Even if this description could provide a reasonable basis to believe that a crime had been committed, thirty minutes had elapsed between its commission and when [the officer] shot [the decedent].  Since [the decedent] was not committing a crime at the moment of his death, this factor weighs in Plaintiff's favor.") (internal citation omitted).

/////

1    The city defendants contend that during the confrontation, decedent Zenka—while

2    brandishing his knife—suddenly ran toward the exit where defendant Pinola was positioned,

3    which provided grounds for the use of lethal force due to the threat he posed at that point.  (Doc.

4    No. 44-1 at 9, 12–13.)  However, there is a genuine dispute as to whether decedent Zenka was

5    committing an assault with a deadly weapon on defendants Pinola and Simpson when he was shot

6    by them.  Construing the facts as they are depicted in the PTZ #7 video footage, a reasonable jury

7    could conclude that the decedent's movement in the direction of the exit was as an attempt to

8    move away from the officers firing beanbags and 40mm rounds rather than any attempted

9    assault.[18]  In other words, a jury could find that officers did not reasonably believe that the

10   decedent was committing an act that by its nature would directly and probably result in the

11   application of force to another, which is the first element of assault under California Penal Code

12   § 241(c).  *See* CALCRIM No. 900 (stating that the first element of California Penal Code §

13   241(c) is that "[t]he defendant did an act that by its nature would directly and probably result in

14   the application of force to a person").

15       In short, viewing the evidence on summary judgment in the light most favorable to

16   plaintiff, consideration of this this factor weighs in plaintiff's favor.

17                    ii.    Immediate Threat

18       The next factor is whether decedent Zenka posed an immediate threat to the safety of the

19   officers or to others during the incident.  *See Graham*, 490 U.S. at 396.  The Ninth Circuit has

20   repeatedly emphasized that this factor is the most important.  *See, e.g., S.B. v. Cnty. of San Diego*,

---

[18]  The Supreme Court has recognized that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.  It is not better that all felony suspects die than that they escape.  Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."  *Garner*, 471 U.S. at 11.  The Ninth Circuit has held that "[l]aw enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat of injury to persons" and "whenever practicable, a warning must be given before deadly force is employed."  *Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir. 1997).  Here, defendants have conceded that "[o]fficers did not have information that [decedent] Zenka was a fleeing felon who had committed a serious crime, such as would justify shooting him under *Garner*'s fleeing felon rule."  (PSAFC ¶ 126; PSAFS ¶ 126.)

22

1   864 F.3d 1010, 1013 (9th Cir. 2017) ("Of all these factors, the 'most important' one is 'whether

2   the suspect posed an immediate threat to the safety of the officers or others.'") (quoting *George v.*

3   *Morris*, 736 F.3d 829, 838 (9th Cir. 2013)); *Gonzalez*, 747 F.3d at 793 ("The immediacy of the

4   threat posed by the suspect is the most important factor.").   To determine "whether there was an

5   immediate threat, a simple statement by an officer that he fears for his safety or the safety of

6   others is not enough; there must be objective factors to justify such a concern."   *Mattos*, 661 F.3d

7   at 441–42 (internal quotation marks and citation omitted).   "A desire to resolve quickly a

8   potentially dangerous situation is not the type of governmental interest that, standing alone,

9   justifies the use of force that may cause serious injury."   *Bryan*, 630 F.3d at 826.   "Rather, the

10   objective facts must indicate that the suspect poses an *immediate* threat to the officer[s] or a

11   member of the public."   *Id.* (emphasis added).

12      The court will assess whether the decedent posed an immediate threat during different

13   phases of the encounter with officers when force was used:  (A) the initial use of force before the

14   decedent moved toward the exit; (B) the force used as the decedent moved toward the exit; (3) the

15   force used after the decedent fell to the ground.

16                    (A)      Initial Use of Less-Lethal Force

17      The city defendants contend that decedent Zenka posed an immediate threat when officers

18   used less-lethal force on the decedent before he fell to the ground.  (Doc. No. 44-1 at 13.)  The

19   immediate threat, they contend, was based on the fact that the decedent was "wielding a large

20   knife, had already evidenced that he was willing to harm by using the knife to slice into his own

21   neck, had previously charged officers with his knife in hand, and refused to comply with the

22   instructions, commands, and alternative uses of communications of officers."  (*Id.* at 14.)  The

23   court acknowledges that the decedent's possession of a knife may have suggested some risk of

24   harm.  However, although the decedent's possession of a bread knife "is a consideration, it is far

25   from dispositive."  *V.R. v. San Bernardino Cnty.*, No. 19-cv-01023-JGB-SP, 2022 WL 656133, at

26   *10 (C.D. Cal. Feb. 3, 2022); *see also Estate of Lopez ex rel. Lopez v. Gelhaus,* 871 F.3d 998,

27   1013 (9th Cir. 2017) (stating that simply possessing a weapon does not justify the use of deadly

28   force, and even a person visibly holding a weapon is not necessarily an immediate threat); *Glenn*,

673 F.3d at 873 (concluding that a suspect holding a knife was not an immediate threat because he "was not threatening anyone with the knife").  Instead, "courts must consider 'the totality of the facts and circumstances in the particular case'; otherwise, that a person was armed would always end the inquiry."  *Glenn*, 673 F.3d at 872 (citation omitted).

Viewing the evidence in the light most favorable to plaintiff, a jury could find that when the beanbag and 40mm projectiles were deployed on decedent Zenka before he fell to the ground, there was minimal indication that he could immediately harm anyone.  Decedent Zenka had in his possession a serrated bread knife only, which he was holding but not clearly brandishing at anyone at the time the less-lethal force was used.  *See Glenn*, 673 F.3d at 873 (explaining that the court must engage "in a context-specific analysis rather than resting our holding on the single fact that the suspect was armed" and distinguishing itself from cases in which courts determined that the officers were entitled to qualified immunity, noting that the suspects in those cases had far more dangerous weapons, whereas the decedent in *Glenn* only "had a pocketknife with a three-inch blade, which he did not brandish at anyone, but rather held to his own neck"); *V.R.*, 2022 WL 656133, at *10 (finding that the "immediate threat" factor weighed in favor of the plaintiff, stating "in *Blanford* [*v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005)], the suspect brandished a sword, a far more dangerous weapon than Decedent's boxcutter").  Here, decedent Zenka had not previously used the bread knife on anyone; he had only used it on himself.  *See Glenn*, 673 F.3d at 873 (in determining that a reasonable juror could determine that the decedent was not an immediate threat, noting that "the threats of violence known to the responding officers focused on harming himself rather than other people").  At no point did decedent Zenka verbally threaten to attack the officers or anyone else.  There is no evidence before the court on summary judgment that there were any bystanders or first responders in the store.  Furthermore, there were over fifteen officers surrounding the decedent, many with weapons trained on him and twenty-two officers at the scene.  Considering these facts, a reasonable jury could conclude that decedent Zenka did not pose an immediate threat when beanbag and 40mm projectiles were initially deployed by Lindner, Espinoza, Finnecum, Swaleh, and Helmich.  *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1032 (9th Cir. 2018) (reversing grant of summary judgment on Fourth

Amendment excessive force claim, finding that a reasonable juror could conclude that the decedent was not an immediate threat to officers where "officers had surrounded the front door to the 7-Eleven, had established positions behind cover of their police vehicles, and outnumbered [the decedent] eight to one"); *White v. Cnty. of San Diego*, No. 13-cv-01166-MMA-RBB, 2014 WL 9859196, at *6 (S.D. Cal. Dec. 12, 2014) ("Finally, at the time of the shooting, there were 5 law enforcement officers on scene with 3 guns trained directly on [the decedent].  Viewing these facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that [the decedent] did not pose an 'immediate threat' to [the deputy] that necessitated the use of deadly force.").

Accordingly, as to defendants Lindner, Espinoza, Finnecum, Swaleh, and Helmich's initial use of force, consideration of this factor weighs in favor of plaintiff.

        (B)  Use of Force as the Decedent Was Moving Toward the Exit

As the decedent moved toward the exit door, nearing defendants Pinola and Simpson, he remained armed with the serrated bread knife despite repeated orders to drop it over a span of approximately twenty minutes.  His movement escalated the level of threat compared to that posed when he was initially standing in the produce aisle and cutting himself.  When the decedent began moving, he still had over fifteen officers surrounding him, many with weapons aimed at him.

In their pending motions, defendants Pinola and Simpson argue that they shot decedent Zenka because of the risk that he posed to them personally, not focusing on the risk that he may have posed to the public if he successfully exited the store.  Specifically, defendant Pinola states he fired his weapon only after "Mr. Zenka raised his large knife toward Officer Pinola as Mr. Zenka lunged to escape."  (Doc. No. 44-1 at 12–13.)[19]  Similarly, defendant Simpson says that he fired his weapon "because Zenka was running toward Simpson's location with a knife at chest level."  (Doc. No. 45-1 at 13.)

There is a genuine dispute of material fact as to whether decedent Zenka was within striking distance of defendants Pinola and Simpson when they fired their lethal shots.  A

---

[19]  In the PTZ #7 video, decedent Zenka does not appear to be lunging; rather, he looks as if he is merely shuffling to his right.  (PTZ-7 at 00:12–00:13.)

reasonable jury could find from the evidence that decedent Zenka, shuffling toward defendants Pinola and Simpson and ten to fifteen feet away when shot, was not within striking distance of those officers.  *See White*, 2014 WL 9859196, at *6 (finding that when viewed in light most favorable to the plaintiff, eight feet away from the deputy was not within striking distance). Whether decedent Zenka posed an "immediate threat" to defendants Pinola and Simpson's safety is thus a triable issue of fact.  *See Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1228, 1234 (9th Cir. 2013) (finding that there was a triable issue of whether excessive force was used where the individual shot was "walking towards the deputies" with a knife pointed down but was "not charging," and was six to eight feet away from the nearest officer,); *S.B.*, 864 F.3d at 1014 (finding that there was a triable issue as to whether excessive force was used because the suspect was approximately six to eight feet away when he grabbed the knife); *N.E.M. v. City of Salinas*, 761 F. App'x 698, 699–700 (9th Cir. 2019) (affirming the denial of summary judgment to officers who shot a suspect who was wielding garden shears, after he had swung the shears at officers, when the suspect turned toward officers less than nine feet away).

Moreover, it was while the decedent was moving toward the exit door and in the direction of defendants Pinola and Simpson that defendant Tsverov first deployed his taser on the decedent. While there is a genuine dispute of fact as to whether the decedent posed an immediate threat to defendants Pinola and Simpson as discussed above, the court finds no genuine dispute that the decedent posed a potential threat to those officers, as well as others, if he were to leave the store. This potential threat supports the reasonableness of defendant Tsverov's initial use of the taser on the decedent.  *See Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) (concluding that "some force was surely justified in restraining [the plaintiff] so that he could not injure either himself or the arresting officers"); *De Contreras v. City of Rialto*, 894 F. Supp. 2d 1238, 1249, 1253 (C.D. Cal. 2012) (holding that in regards to the officer's first use of the taser on the suspect, the second *Graham* factor—"the threat posed by the suspect to the officer and the public"—favored the government, stating "a reasonable officer in [the defendant officer's] circumstances would have feared that [the suspect] had a knife based on the initial 9–1–1 call, would have observed that [the suspect] at the moment was agitated and willing to engage

1  in violence, and would have perceived that, at a minimum, [the suspect's] physical gestures and

2  movements were potentially threatening").

3      Accordingly, as to defendants Pinola and Simpson's use of lethal force during this phase

4  of the encounter, consideration of this factor weighs in favor of plaintiff.  However, as to

5  defendant Tsverov's intermediate level of force at this point in the encounter, this factor weighs

6  in favor of him.

7                    (C)      Use of Force After the Decedent Fell to the Ground

8      Next, the court considers whether decedent Zenka posed an immediate threat when

9  defendants Tsverov, Lindner, and Helmich used force on the decedent after he fell to the ground.

10  The city defendants argue that the officers were justified in using force because when the

11  decedent fell to the floor, the knife was still in his hand, and though officers commanded that he

12  release the knife, the decedent did not comply.  (Doc. No. 44-1 at 14.)  After decedent Zenka had

13  been struck by numerous beanbag and 40mm rounds, as well as by a taser, struck by lethal

14  gunshots, and had been taken to the ground and was lying on his back, defendant Tsverov

15  deployed his taser two additional times and defendants Lindner and Helmich each fired one more

16  40mm round.  In the PTZ video, decedent Zenka appears to have been wounded; he is not making

17  any threatening gestures or attempting to get up.  (PTZ-7 at 00:14–00:42.)  A reasonable jury

18  could find from this evidence that decedent Zenka posed no immediate threat at that point.  *See*

19  *Zion v. Cnty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017) (holding that an officer was not

20  entitled to summary judgment on an excessive force claim because "[a] reasonable jury could find

21  that [decedent] was no longer an immediate threat, and that [the officer] should have held his fire

22  unless and until [the decedent] showed signs of danger or flight" or "that the second round of

23  bullets was justified, but not the head-stomping"); *Jones v. Las Vegas Metro. Police Dep't*, 873

24  F.3d 1123, 1131–32 (9th Cir. 2017) (finding that the officers' use of force once the suspect was

25  on the ground after his body locked up due to taser shocks to be unreasonable).

26      Accordingly, as to defendants Tsverov, Lindner, and Helmich's use of force on the

27  decedent after he fell to the ground, consideration of this favor weighs heavily in favor of

28  plaintiff.

1                      iii.      Resistance or Attempt to Evade Arrest

2          In considering the third *Graham* factor the court is to ask whether the decedent Zenka was

3    "actively resisting arrest or attempting to evade arrest by flight" at the time the force was used.

4    *Deorle*, 272 F.3d at 1280.  The Ninth Circuit views resistance on a continuum, ranging from "the

5    purely passive protestor who simply refuses to stand" to "the individual who is physically

6    assaulting the officer." *Bryan*, 630 F.3d at 830.  While "purely passive resistance can support the

7    use of some force, [ ] the level of force an individual's resistance will support is dependent on the

8    factual circumstances underlying that resistance." *Id.*

9          The court will analyze whether the decedent was actively resisting arrest or attempting to

10   evade arrest by flight during different phases of the encounter when force was used:  (A) the

11   initial use of force before the decedent moved toward the exit; (B) the force used as the decedent

12   moved toward the exit; and (C) the force used after the decedent fell to the ground.

13                        (A)      Initial Use of Less-Lethal Force

14         When less-lethal force was initially deployed, decedent Zenka had not complied with

15   officers' commands to drop the knife, but he was not attempting to flee or run from the officers.

16   Decedent Zenka did not threaten officers, and there is no evidence before the court that he made

17   any threatening gestures.  Consequently, the evidence on summary judgment demonstrates that, at

18   the time force was first used, decedent Zenka was passively resistant.  *See Rice v. Morehouse*,

19   989 F.3d 1112, 1127 (9th Cir. 2021) (stating that refusing multiple commands but not swearing at

20   or threatening officers is passive resistance); *Gravelet-Blondin*, 728 F.3d at 1090, 1092 (stating

21   that refusing officers' commands to step back but making "no threatening gestures" is passive

22   resistance).  As a result, "the use of non-trivial force *of any kind*" based solely on the decedent's

23   passive resistance would be "unreasonable." *Rice*, 989 F.3d at 1126 (quoting *Gravelet-Blondin*,

24   728 F.3d at 1094).  This factor weighs against the reasonableness of the defendant officers' initial

25   use of less-lethal force.

26                        (B)      Use of Force as the Decedent Was Moving Toward the Exit

27         Next, the court considers whether decedent Zenka was attempting to flee when defendant

28   Tsverov first deployed his taser and defendants Pinola and Simpson shot him.  The evidence on

28

summary judgment establishes that, at that point, the decedent was still armed with the bread knife and was moving toward the store exit, potentially justifying the use of some degree of force. *See Beaver v. City of Fed. Way*, 301 F. App'x 704, 705 (9th Cir. 2008) (holding that officers were entitled to qualified immunity where they tased an arrestee who was suspected of committing a daytime burglary and the arrestee was attempting to flee, ignoring commands, and remained non-compliant).

In her opposition, plaintiff argues that decedent Zenka only moved toward the exit after being shot at by beanbag and 40mm rounds and cites the Ninth Circuit's decision in *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011) to suggest that the officers' actions constituted "provocative conduct" which triggered the decedent's "limited right to offer reasonable resistance." (Doc. No. 48 at 23) (quoting *Young*, 655 F.3d at 1164). In its decision in *Young*, the Ninth Circuit reasoned that "a jury could easily conclude that [the plaintiff's] alleged conduct of 'moving' and 'circling'—far from indicating any objective safety threat to [a deputy]—was simply a reasonable response from an individual who was pepper sprayed from behind without warning while sitting on the sidewalk." 655 F.3d at 1164. This court agrees that based upon the evidence presented on summary judgment, a reasonable jury could conclude that decedent Zenka's movement toward the exit was a reaction to the less-lethal weapons being fired at him. Nonetheless, plaintiff concedes that the decedent was making his way toward the exit door, and plaintiff does not attempt to argue that the decedent was not fleeing, making this case distinguishable from the decision in *Young*. *See* 655 F.3d at 1165 ("[The plaintiff] was not being placed under arrest nor attempting to flee when [a deputy] began to pepper spray him; in fact, [the deputy] pepper sprayed him before even providing him with a warning that he could be arrested for his noncompliance with [the deputy's] order that he reenter his truck.").

While the decedent's movement could be found to be a response to the less-lethal force used on him, the court concludes that there was a government interest in the use of some degree of force because the decedent was undisputedly moving toward the exit door. *See Beaver v. City of Fed. Way*, 507 F. Supp. 2d 1137, 1144 (W.D. Wash. 2007) ("[The plaintiff] was attempting to flee and the Court has no trouble concluding that the first tasing was justified to stop him."), *aff'd*,

1   301 F. App'x 704 (9th Cir. 2008).  Therefore, at this point of the incident, this factor supports the

2   use of some force, though not deadly force, given the genuine dispute of fact over whether the

3   decedent posed an immediate threat or a serious threat of injury to others.  *See Harris v. Roderick*,

4   126 F.3d 1189, 1203 (9th Cir. 1997) ("Law enforcement officers may not shoot to kill unless, at a

5   minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his

6   escape will result in a serious threat of injury to persons.").

7                               (C)      Use of Force After the Decedent Fell to the Ground

8           After decedent Zenka fell to the ground, the situation changed.  The evidence on summary

9   judgment is that despite still holding a knife, the decedent made no attempt to rise and appears to

10  have been severely injured.  (PTZ-7 at 00:14–00:42.)  Based on this evidence, a jury could find

11  that it would be unreasonable for officers at this juncture of the encounter to expect compliance

12  with commands.  Consequently, as to the force used on the decedent after he fell to the ground,

13  consideration of this factor strongly favors plaintiff.

14                               iv.     Other Factors

15          Of course, the *Graham* factors are not exhaustive.  The Ninth Circuit instructs courts to

16  "examine the totality of the circumstances and consider whatever specific factors may be

17  appropriate in a particular case, whether or not listed in *Graham*."  *Bryan*, 630 F.3d at 826

18  (internal quotation marks and citation omitted).  These additional factors include the availability

19  of less intrusive alternatives, whether the officer gave a warning before using lethal force, and the

20  mental condition of the victim.  *Id.* at 829–30.

21          In considering the availability of alternative methods of capturing or subduing a suspect,

22  police officers need not employ the least intrusive means available but need only act within the

23  range of reasonable conduct.  *Browder*, 929 F.3d at 1138.  "However, 'police are required to

24  consider [w]hat other tactics if any were available,' and if there were 'clear, reasonable and less

25  intrusive alternatives' to the force employed, that 'militate against finding [the] use of force

26  reasonable.'"  *Id.* (citations omitted).

27  /////

28  /////

(A)     Less Intrusive Alternatives

"Although officers are not required to use the least intrusive degree of force available, the availability of alternative methods of capturing or subduing a suspect may be a factor to consider[.]"  *Vos*, 892 F.3d at 1033 (internal quotation marks and citations omitted).

Here, based upon the evidence presented on summary judgment, a reasonable jury could certainly find that the officers had less intrusive force options available to them.  Multiple officers at the scene had tasers in their duty belts throughout the incident, including the Taser 7, which has an effective range of approximately twenty-one feet according to the evidence before the court.  Defendants acknowledge that tasers can be effectively used against suspects armed with knives from a distance to get them to drop the knife and take them into custody without the use of deadly force.  However, the state defendants argue in response to this fact that the absence of evidence regarding the specific taser model possessed by defendant Simpson—an X series—renders this point irrelevant with respect to him.  (PSAFS ¶ 29.)  However, in support of this fact, plaintiff cited the deposition of defendants' retained expert, Mr. Meyer, who testified that a taser—without specifying which type—can incapacitate and get someone to fall from fifteen feet away.  (*See* PSAF ¶ 29) (citing Doc. No. 48-12 at 15).  Notably, the state defendants failed to refute the potential effectiveness of the taser X possessed by defendant Simpson.  Consequently, they have not met their initial burden of production with respect to this issue.  *See Mollica v. Cnty. of Sacramento*, No. 2:19-cv-02017-KJM-DB, 2023 WL 3481145, at *13 (E.D. Cal. May 16, 2023) ("[D]efendant here again has not persuaded the court there is no genuine dispute of material fact by merely concluding plaintiff has no evidence."); *Rundgren v. Wash. Mut. Bank, F.A.*, 09-cv-00495-JMS-KSC, 2011 WL 13070777, at *3 (D. Haw. Aug. 23, 2011) ("[The defendant] cannot carry its initial burden on summary judgment through mere *argument* that Plaintiffs cannot come forward with evidence to support their claims.").

Furthermore, in addition to having a taser, defendant Pinola testified that he had a K-9 next to him and acknowledged that a K-9 is generally considered a less-lethal option.  (Doc. No. 48-4 at 15.)  Plaintiff's expert, Mr. Clark, opined that releasing the K-9 was a reasonable alternative measure to the use of lethal force.  (Doc. No. 48-1 at 7.)

1   Viewing the evidence presented by the parties on summary judgment in the light most

2   favorable to plaintiff, the undersigned concludes that a reasonable juror could find that the use of

3   a taser or K-9 on the decedent would have been effective in disarming him and preventing him

4   from getting to defendant Simpson and Pinola's location or leaving the store.  *See Vos*, 892 F.3d

5   at 1033 (finding that excessive force was a triable issue where a 40mm less-lethal weapon, a

6   taser, and a K-9 were available to officers and may have been effective in addressing the

7   situation); *Est. of Carreno v. Cnty. of Santa Barbara*, No. 2:18-cv-03694-SK, 2020 WL 1172721,

8   at *3 (C.D. Cal. Jan. 25, 2020) (finding that there was a triable issue of fact as to whether the

9   force employed was excessive where officers did not appear to consider less-lethal alternatives

10  even though the lead officer had his K-9 dog, a taser, and baton).

11              (B)     Warnings

12              Next, it is undisputed that no officer gave decedent Zenka a verbal warning before using

13  force against him.  This is significant.  The Ninth Circuit has recognized that "[a]ppropriate

14  warnings . . . should be given, when feasible, if the use of force may result in serious injury."  *See*

15  *Glenn*, 673 F.3d at 876 (citations omitted); *see also Browder*, 929 F.3d at 1137 ("The seemingly

16  obvious principle that police should, if possible, give warnings prior to using force is not novel,

17  and is well known to law enforcement officers.").  In their reply, the city defendants argue that it

18  was not feasible for defendants to issue a warning in this situation (Doc. No. 52 at 7), but it

19  remains at the very least unclear based upon the evidence before the court on summary judgment

20  whether that was true.  Officers acknowledged that, at the time defendant Hunkapiller gave the

21  order to advance, decedent Zenka did not appear to officers to pose an immediate threat of death

22  or serious bodily harm to anyone else.  Thus, viewing the facts in the light most favorable to

23  plaintiff, a reasonable jury could find that the defendant officers who initially employed less-

24  lethal force could have issued a warning before doing so, since there was no immediate threat

25  posed to them or others at that time.

26              With respect to defendant Pinola's failure to provide a warning before deploying lethal

27  force, the city defendants argue in their reply that he did not have time to issue a warning

28  "because the rapid timeframe precluded such an action."  (Doc. No. 52 at 7.)  The court also finds

1    this argument to be unpersuasive in light of the evidence presented on summary judgment.

2    Having predicted decedent Zenka would make his way toward the exit in response to the

3    deployment of less-lethal force, a reasonable jury could also find that defendant Pinola could have

4    issued a warning before his use of lethal force.

5        Concerning defendant Simpson, the state defendants' reply argues that "[o]ther officers

6    were already giving Zenka commands, and Simpson did not want to confuse Zenka by giving him

7    too many commands."  (Doc. No. 53 at 12.)  However, this argument misses the mark.  Even

8    though officers commanded decedent Zenka to "drop the gun," the parties here agree that no

9    officer warned the decedent of the consequences, i.e., that failure to comply would result in any

10   force, let alone deadly force.  *See Browder*, 929 F.3d at 1136–37 (explaining that "[w]hether an

11   officer warned a suspect that failure to comply with the officer's commands would result in the

12   use of force is another relevant factor in an excessive force analysis" and holding that the

13   defendant officer was not entitled to qualified immunity where there was "no dispute that [the

14   officer] never warned [the decedent] that a failure to comply would result in the use of force, let

15   alone deadly force").

16                          (C)    The Decedent's Mental Condition

17       The Ninth Circuit has emphasized that "where it is or should be apparent to the officers

18   that the individual involved is emotionally disturbed, that is a factor that must be considered in

19   determining, under *Graham*, the reasonableness of the force employed."  *Deorle*, 272 F.3d at

20   1283; *see also Glenn*, 673 F.3d at 875–86 (noting that the officers should have considered that the

21   decedent was emotionally disturbed when they arrived and found him holding a knife to his own

22   neck); *Vos*, 892 F.3d at 1034 n.9 ("[O]ur precedent establishes that if officers believe a suspect is

23   mentally ill, they 'should . . . ma[k]e a greater effort to take control of the situation through less

24   intrusive means.'") (citations omitted).

25       However, when a person appears to be emotionally disturbed, officers can still use deadly

26   force without violating the Fourth Amendment if there is an immediate threat to themselves or

27   others.  *See Lal v. California*, 746 F.3d 1112, 1119 (9th Cir. 2014) ("That [the decedent] may

28   have been intent on committing 'suicide by cop' does not negate the fact that he threatened the

                                        33

1   officers with such immediate serious harm that shooting him was a reasonable response.").  As

2   previously discussed, the evidence before the court on summary judgment indicates that the

3   decedent did not pose an immediate threat to anyone during the defendant officers' encounter

4   with him.  However, as noted above, he did pose a potential threat of some degree when

5   defendant Tsverov initially tased him.

6        Finally, the evidence on summary judgment establishes that the defendant officers

7   suspected decedent Zenka was experiencing a mental health crisis.  Accordingly, the court finds

8   that the government's interest in the use of force was diminished.  *See Deorle*, 272 F.3d at 1283

9   ("Even when an emotionally disturbed individual is 'acting out' and inviting officers to use

10  deadly force to subdue him, the governmental interest in using such force is diminished by the

11  fact that the officers are confronted, not with a person who has committed a serious crime against

12  others, but with a mentally ill individual."); *Vos*, 892 F.3d at 1034 ("Finally, it is undisputed that

13  Vos was mentally unstable, acting out, and at times invited officers to use deadly force on him.

14  These indications of mental illness create a genuine issue of material fact about whether the

15  government's interest in using deadly force was diminished.").

16              c.      *Balancing and Objective Reasonableness*

17       The court is to conclude the *Graham* analysis of whether the force used by the defendant

18  officers was reasonable by balancing "the gravity of the intrusion on the individual against the

19  government's need for that intrusion."  *Miller*, 340 F.3d at 964.

20                    i.      Beanbags, 40mms, and Lethal Gunshots

21       As previously discussed, the use of less-lethal force through deployment of beanbags and

22  40mm projectiles constituted a significant encroachment upon the decedent's liberty interests,

23  while the deployment of lethal gunshots constituted an extreme infringement.  When evaluating

24  the countervailing governmental interest that it must weigh against this intrusion, the court finds

25  that consideration of those factors weighs against a finding that the deployment of beanbag and

26  40mm rounds as well as the lethal force used in this case was reasonable, as detailed above.

27       Consequently, when considering the evidence on summary judgment in the light most

28  favorable to plaintiff, the court concludes that a reasonable jury could find that the lethal force

1    used by defendants Pinola and Simpson, as well as the less-lethal force employed by defendants

2    Finnecum, Swaleh, Espinoza, Lindner, and Helmich, was excessive and in violation of the Fourth

3    Amendment.

4                        ii.      Taser Deployments

5         The court now turns to defendant Tsverov's use of a taser on decedent Zenka, which, as

6    stated above, constitutes "an intermediate, significant level of force that must be justified by the

7    governmental interest involved." *Bryan*, 630 F.3d at 826. As discussed above, defendant

8    Tsverov deployed his taser on the decedent both before and after the decedent fell to the ground.

9         With respect to Tsverov's use of a taser on the decedent before he fell to the ground,

10    based on the evidence provided on summary judgment, the court finds that the force used in this

11    regard was objectively reasonable as a matter of law. At that point, officers were confronted with

12    an individual armed with a knife, who failed to drop the knife after being commanded to do so for

13    approximately twenty minutes and was approaching the exit and defendants Pinola and Simpson.

14    On these facts, which are not genuinely disputed, a reasonable jury could not conclude that the

15    deployment of a taser by defendant Tsverov was excessive. *See Jones*, 873 F.3d at 1130

16    ("Despite [the decedent's] large size and the fact that he had run away from a traffic stop, he had

17    neither threatened [the officer] nor committed a serious offense, and he didn't appear to have a

18    weapon. Based on these facts, [the officer] believed that something less than deadly force was

19    justified, so he used his taser to subdue [the decedent]. This decision was consistent with our case

20    law, as we've held that use of tasers can be intermediate force. Using a taser to stop [the

21    decedent] and place him under arrest was reasonable under the circumstances.") (internal citation

22    omitted); *compare Bryan*, 630 F.3d at 822, 831 (finding that the use of a taser constituted

23    excessive force where the suspect was "standing twenty to twenty-five feet away and not

24    attempting to flee").

25         The court's conclusion here is bolstered by the fact that in plaintiff's own brief in

26    opposition to the pending motion, it is suggested that officers should have used tasers to

27    incapacitate decedent Zenka:

28    /////

1

2

3

4

5

> Despite these officers' availability, the fact that many officers were
> equipped with Tasers with effective ranges of up to 21 feet, and
> Tasers' efficacy at incapacitating suspects from a distance—efficacy
> of which Hunkapiller was aware—including those armed with
> knives, Hunkapiller did not designate any Taser officer, whether as
> part of the contact team or elsewhere.  When an officer offered to
> provide a "long-distance Taser" as part of the contact team,
> Hunkapiller declined, responding, "I just want beanbag[ launcher]s
> and 40s."

6  (Doc. No. 48 at 10) (internal citations omitted).  Furthermore, plaintiff's own expert argues that

7  officers should have used tasers, stating that "[r]ather than using overwhelming less-lethal force

8  prior to the shooting such as the beanbags and 40mm launchers, the officers should have utilized

9  tasers, including taser officers in the contact team and tasing Mr. Zenka upon their initial

10  approach."  (Doc. No. 48-1 at 7.)  Consequently, the court will grant the city defendants' motion

11  for summary judgment in defendant Tsverov's favor on plaintiff's excessive force claim to the

12  extent that claim is based on defendant Tsverov's use of the taser before the decedent fell to the

13  ground.

14  However, after decedent Zenka collapsed to the ground, the evidence on summary

15  judgment shows that the countervailing government interest decreased.  Decedent Zenka

16  objectively posed far less of a threat than when he was standing up and moving toward the exit

17  and toward defendants Pinola and Simpson.  A reasonable officer seeing Zenka fall to the floor,

18  after being visibly shot and having just been tased, would have far less fear that he was in a

19  condition allowing him to attack anyone with a knife.  At that point, based upon the evidence

20  presented, a reasonable juror could find that although Zenka still had a knife in his hand, he was

21  under the officers' control and that the justification for the use of force had waned.  *See Jones*,

22  873 F.3d at 1130 (noting that "[a]s the situation evolved, . . .  the justification for the use of force

23  waned" when a suspect was subdued and on the ground after being tased); *Drummond*, 343 F.3d

24  at 1059 (concluding that while "some force was surely justified in restraining [the plaintiff] so

25  that he could not injure either himself or the arresting officers" but "after he was handcuffed and

26  lying on the ground, the force that the officers then applied was clearly constitutionally excessive

27  when compared to the minimal amount that was warranted"); *LaLonde v. Cnty. of Riverside*, 204

28  F.3d 947, 961 (9th Cir. 2000) ("[T]he use of [non-lethal] weapons . . .  may be reasonable as a

1   general policy to bring an arrestee under control, but in a situation in which an arrestee surrenders

2   and is rendered helpless, any reasonable officer would know that a continued use of the weapon

3   or a refusal without cause to alleviate its harmful effects constitutes excessive force."); *De*

4   *Contreras*, 894 F. Supp. 2d at 1253–54 (finding that an officer's first application of a taser on an

5   individual was reasonable as a matter of law, but that the second application of a taser, when the

6   individual had already collapsed after the first taser, was potentially unreasonable since the

7   individual posed much less threat at that point).  Viewing the evidence on summary judgment in

8   the light most favorable to plaintiff, a reasonable jury could find that defendant Tsverov's

9   deployment of his taser on decedent Zenka after he fell to the ground constituted excessive force

10  in violation of the Fourth Amendment.

11              d.       *Whether the Right Was Clearly Established*

12          Even if a reasonable jury could find that the defendant officers violated plaintiff's Fourth

13  Amendment right against the use of excessive force, the officers would be entitled to summary

14  judgment in their favor on qualified immunity grounds if the right was not clearly established at

15  the time of the encounter.  *See C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252, 1257 (9th

16  Cir. 2016).   "A Government official's conduct violates clearly established law when, at the time

17  of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every

18  'reasonable official would [have understood] that what he is doing violates that right.'"  *Ashcroft*

19  *v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

20  "We do not require a case directly on point, but existing precedent must have placed the statutory

21  or constitutional question beyond debate."  *Id.*

22          As plaintiff point outs (Doc. No. 48 at 20), in 2018, the Ninth Circuit held in its decision

23  in *Vos v. City of Newport Beach*, 892 F.3d 1024, 1033 (9th Cir. 2018) that it may be unreasonable

24  to use deadly force against a mentally unstable individual, even where the individual is aggressive

25  and armed.  In *Vos*, officers shot and killed a man, who had reportedly been behaving erratically

26  inside a 7-Eleven store and had cut a store employee with scissors, when he unexpectedly charged

27  toward the officers at the store's doorway with what appeared to be a weapon raised above his

28  head.  892 F.3d at 1028–30.  "The officers knew that [the decedent] had been simulating having a

gun and that he was agitated, appeared angry, and was potentially mentally unstable or under the influence of drugs." *Id.* at 1029.  Officers at the scene believed that the weapon the decedent was holding when he ran toward them was a pair of scissors.  *Id.*  The Ninth Circuit rejected the defendants' argument that deadly force was reasonable because the decedent "forced the confrontation" by charging officers.  *Id.* at 1032–33.  In determining that a jury could find that the force used was unreasonable, the court considered the evidence that the officers outnumbered the decedent eight to one, the officers did not believe that the decedent was armed with a gun, and less-lethal force options were available to the officers, including a 40-millimeter less-lethal weapon, a K-9 unit, and taser, and found that those less-lethal weapons would have been within range when the decedent was shot.  *Id.*

When viewed in the light most favorable to plaintiff, the evidence on summary judgment in this case is very similar to evidence before the court in *Vos*.  Decedent Zenka, like the decedent in *Vos*, appeared mentally unstable, was outnumbered by officers, not within striking distance of any officer, and less intrusive options were available that had sufficient range.  Thus, in light of the decision in *Vos*, all reasonable officers would have known that it was impermissible to use deadly force under the circumstances.  *See id.* at 1034–35; *see also Penny v. Azmy*, No. 22-55572, 2024 WL 489287, at *2 (9th Cir. Feb. 8, 2024) ("The decision in *Vos* confirms that as of 2018, a reasonable police officer would have understood that the use of deadly force against a possibly mentally ill suspect when there were numerous officers present, multiple less intrusive options readily available, and no immediate threat of serious physical injury—even where the suspect held an object that officers could have perceived to be dangerous if used as a weapon—was excessive force and so a Fourth Amendment violation.") (citing *Vos*, 892 F.3d at 1034–35).

Plaintiff also relies on the decision in *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011) to argue that it was clearly established that the use of beanbag guns and similar weapons was unreasonable under these circumstances.  (Doc. No. 48 at 20–21, 26–27.)  In *Glenn*, an officer used a beanbag shotgun to shoot a suicidal teenager carrying a knife because the officer believed the teenager posed an immediate threat to officers and bystanders, and the teenager refused to obey the defendant officers' commands to drop the knife.  673 F.3d at 873, 875.  The

Ninth Circuit determined that the officers' use of force was excessive, in part, because the suspect was mentally ill, not in a physical altercation with anyone, no one was trying to get away from the suspect, the suspect was not threatening anyone with the weapon, and there were less intrusive ways of responding. *Id.* at 875–76.  In so concluding, the court noted that the suspect "stayed in the same position from the moment officers arrived and showed no signs of attempting to move until after he was fired upon." *Id.* at 874.  Viewing the evidence on summary judgment in the light most favorable to plaintiff, the same can be said here.  The Ninth Circuit's decision in *Glenn* is sufficiently factually analogous to put the defendant officers on notice that their deployment of a beanbag shotgun, or a similar weapon (i.e., 40mm shotgun) would be excessive under these circumstances.

Additionally, plaintiff relies on the decision in *Zion v. County of Orange*, 874 F.3d 1072 (9th Cir. 2017), arguing that the defendants' use of force used after decedent Zenka was already shot was excessive.  (Doc. No. 48 at 25.)  Indeed, the Ninth Circuit confirmed in *Zion* that it has long been clearly established law that the police cannot continue to use force against a suspect who no longer poses a threat, such as in situations in which the suspect may be wholly incapacitated on the ground after being shot multiple times.  874 F.3d at 1076 (citing *Drummond*, 343 F.3d at 1057–58; *Davis*, 478 F.3d at 1053).  Viewing the evidence on summary judgment in the light most favorable to plaintiff as the non-moving party, the court concludes that a reasonable jury could conclude that defendants Tsverov, Lindner, and Helmich violated clearly established law by using force on a dying, incapacitated individual who posed no threat to the officers or anyone else.

Defendants cite the Supreme Court's decision in *Kisela v. Hughes*, 584 U.S. 100 (2018) in arguing that the defendant officers are entitled to qualified immunity.  (Doc. Nos. 44-1 at 13–14; 45-1 at 22.)  The court finds the Supreme Court's decision in *Kisela* to be readily distinguishable based upon the evidence presented in this case on summary judgment.

In *Kisela*, someone had reported that a woman (Hughes) was "hacking a tree with a kitchen knife" and then told the arriving officers that Hughes was "acting erratically." 584 U.S. at 101.  A person matching the suspect's (Hughes) description emerged from a house carrying a

1   large knife at her side and approached another woman who was standing in the driveway of a

2   nearby house.  *Id.*  A chain-link fence separated the three responding officers from the two

3   women.  *Id.*  Those officers all drew their guns and told Hughes to drop the knife at least twice.

4   *Id.*  Hughes did not "acknowledge the officers' presence or drop the knife."  *Id.* at 102.  One of

5   the officers then shot Hughes four times through the fence.  *Id.*  The Supreme Court held that the

6   officer was entitled to qualified immunity because he reasonably believed that Hughes was a

7   danger to the other woman.  *Id.* at 105.

8           There, it was clear that Hughes had a large kitchen knife and was "within striking

9   distance" of the woman bystander.  *Id.* at 107.  In this case, however, decedent Zenka only had a

10   serrated bread knife, there were no discernable bystanders present, and, when viewing the

11   evidence on summary judgment in the light most favorable to plaintiff, decedent Zenka had not

12   come within striking distance of anyone at the time the deadly force was used.  *See id.*; *see also*

13   *AGG v. City of Hayward*, No. 19-cv-00697-DMR, 2020 WL 6047233, at *11 (N.D. Cal. Oct. 13,

14   2020) (finding the Supreme Court's decision in *Kisela* to be distinguishable from the facts in that

15   case because, in *AGG*, "[the decedent] was not within striking distance of either the bystanders or

16   the officers.  [The decedent] had already turned away from [the decedent's ex-girlfriend] and [a

17   bystander] and was walking toward [an officer].  Unlike a bystander, [the officer] was trained and

18   armed.  [The decedent] did not get within striking distance of him and he had the means to retreat

19   and consider his options or wait for backup.").

20           In sum, when viewing the evidence presented on summary judgment in the light most

21   favorable to plaintiff, a reasonable jury could find that defendants Simpson, Pinola, Espinoza,

22   Lindner, Helmich, and Tsverov used excessive force.  Given that those instances of excessive

23   force were clearly established at the time of the incident, defendants Pinola, Simpson, Espinoza,

24   Lindner, Helmich, and Tsverov are not entitled to summary judgment on qualified immunity

25   grounds with respect to plaintiff's Fourth Amendment excessive force claim against them.

26   Consequently, in relation to plaintiff's Fourth Amendment excessive force claim, the court will

27   deny the state defendants' motion for summary judgment in defendant Simpson's favor and will

28   /////

1  deny the city defendants' motion for summary judgment in favor of defendants Pinola, Espinoza,

2  Lindner, Helmich, and Tsverov.[20]

3       2.      Fourteenth Amendment Substantive Due Process Claim:  Individual Liability

4       Defendants next move for summary judgment in their favor on plaintiff's claim alleging

5  that the defendant officers violated her substantive due process rights under the Fourteenth

6  Amendment.  (Doc. Nos. 44-1 at 14; 45-1 at 18.)  In her SAC, plaintiff alleges that the defendant

7  officers "deprived plaintiff of her right to a familial relationship with decedent in such a manner

8  as to shock the conscience . . . ."  (Doc. No. 21 at ¶ 56.)

9       To succeed on her Fourteenth Amendment claim, plaintiff must meet a higher standard

10  than the "objective reasonableness" standard applicable to her Fourth Amendment claim.  *Porter*

11  *v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  Substantive due process is violated when

12  government conduct "can properly be characterized as arbitrary, or conscience shocking."

13  *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992).  The Ninth Circuit recognizes that a

14  parent has constitutionally protected liberty interest in the companionship and society of their

15  child under the Due Process Clause of the Fourteenth Amendment.  *Porter*, 546 F.3d at 1136.

16       "There are two tests used to decide whether officers' conduct 'shocks the conscience.'"

17  *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022).  Determining "[w]hich test applies

18  turns on whether the officers had time to deliberate their conduct."  *Id.*  The "deliberate

19  indifference" standard applies "if the situation at issue 'evolve[d] in a time frame that permits the

20  officer to deliberate before acting.'"  *Id.* (quoting *Porter*, 546 F.3d at 1137).  Where actual

21  deliberation is practical, an officer's "deliberate indifference" may suffice to shock the

22  conscience.  *Porter*, 546 F.3d at 1137.  A different test applies to situations "that escalate so

23  quickly that the officer must make a snap judgment."  *Porter*, 546 F.3d at 1137.  In those cases,

24  the heightened "purpose to harm" standard applies, and the officer's conduct may only be found

25  to shock the conscience if the officer acts with a purpose "to cause harm unrelated to the

26  legitimate object of arrest."  *Id.* at 1139, 1140 (citation omitted).

27   

28  [20]  To be clear, this ruling pertains to defendant Tsverov's use of the taser after decedent Zenka fell to the ground, but not to his use of the taser before the decedent's fall.

Here, both groups of defendants argue that the heightened purpose-to-harm standard applies (Doc. Nos. 44-1 at 14–15; 45-1 at 19), while plaintiff contends that deliberate indifference is the appropriate standard to apply (Doc. No. 48 at 27).

a. *Initial Use of the Taser*

Applying either standard, and viewing the evidence in a light most favorable to plaintiff, the court concludes that defendant Tsverov is entitled to summary judgment on plaintiff's Fourteenth Amendment claim concerning defendant Tsverov's initial use of the taser before decedent Zenka fell to the ground.  For the reasons discussed above, based upon the evidence submitted on summary judgment, the court finds that no reasonable jury could conclude that defendant Tsverov acted with deliberate indifference when he first tased the decedent.  Nor is there any evidence before the court suggesting that defendant Tsverov had an improper purpose to harm the decedent.  The court will therefore grant the city defendants' motion for summary judgment in favor of defendant Tsverov with respect to plaintiff's Fourteenth Amendment claim brought against him to the extent it is based on his first use of the taser, before the decedent fell to the ground.

b. *Other Uses of Force*

i. Initial Use of Less-Lethal Force

Regarding the defendant officers' decision to employ less-lethal force before decedent Zenka began moving toward the exit, the court finds that there is a genuine dispute of material fact as to whether deliberation on the part of officers was feasible under the circumstances confronted.

Defendant Hunkapiller testified at his deposition that the decision to employ a contact team to use less-lethal force against the decedent was made in light of the decedent's apparent need of medical attention and the fact that the decedent was bleeding profusely, non-verbal, and unresponsive.  Based on this evidence, a reasonable jury could conclude that the defendant officers had to make a snap judgment in response to emergent circumstances, and thus, the more demanding purpose-to-harm standard would be applicable.

/////

42

However, a reasonable jury could also find that the officers had ample time for deliberation.  The incident spanned roughly twenty minutes from the decedent's initial interaction with Officer Gray to the point when the defendant officers attempted to contact the decedent using less-lethal force.  As additional officers arrived on scene, there was continued dialogue with the decedent aimed at de-escalation, which could indicate that there was no immediate threat and that the officers were able to deliberate.  Defendant Hunkapiller, who arrived on the scene later than many of the other defendant officers and was responsible for the tactical plan, also appears to have assessed the situation.  For example, at his deposition, Hunkapiller testified that he gave "pause to let, again, the officers try to de-escalate and negotiate with [the decedent]."  (Doc. No. 48-5 at 23.)  Furthermore, defendants conceded that at the time defendant Hunkapiller instructed the contact team to advance, decedent Zenka did not appear to officers to pose an immediate threat of death or serious bodily harm to others.  Therefore, a reasonable jury could conclude from the evidence before the court on summary judgment that the deliberate indifference standard applies to the initial use of force on decedent Zenka before he fell to the ground.  *See Scott v. Smith*, No. 2:20-cv-01872-RFB-EJY, 2023 WL 2504499, at *11 (D. Nev. Mar. 14, 2023) (finding that the officers had time to deliberate before using force where the officers took their time assessing the situation and conversing with the decedent, who posed no threat).

Because there is a genuine dispute as to whether the defendant officers had time to deliberate, the court is unable on summary judgment to resolve which standard applies in this case.  *See Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1168 (E.D. Cal. 2016) ("In the face of genuine disputes of material fact, the Court is not compelled to find which of the standards applies as a matter of law."); *Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1108 (N.D. Cal. 2017) ("Here, there is evidence to support both standards, and the determination should be left to the jury.").

           ii.     Use of Lethal Force as the Decedent Was Moving Toward the Exit

Moving to defendants Pinola and Simpson's decision to shoot decedent Zenka, the evidence on summary judgment establishes that mere seconds elapsed between when decedent Zenka stepped toward defendants Pinola and Simpson and the firing of the fatal shot.  Thus, there

1    is evidence upon which a juror could find the purpose to harm standard to be appropriate.  *See*

2    *Porter*, 546 F.3d at 1140.  However, viewing the evidence in the light most favorable to plaintiff,

3    a trier of fact could also find that defendants Pinola and Simpson had time to deliberate regarding

4    their use of force because they had predicted in advance that the decedent would run toward the

5    door and preemptively stepped up in that direction to prevent him from doing so.

6                              iii.      Use of Less-Lethal Force After the Decedent Fell to the Ground

7            Finally, as to defendants Tsverov, Lindner, and Helmich's decision to use force against

8    the decedent after he had fallen to the ground, on one hand, a reasonable jury could find from the

9    evidence presented that the officers faced an evolving set of circumstances that took place over a

10   short period of time, thus necessitating fast action on their part.  *See id.* at 1139.  However,

11   because the decedent had fallen to the ground, a reasonable jury could also find that those officers

12   had time to deliberate about whether the use of any further force was necessary.  *See Wroth v.*

13   *City of Rohnert Park*, No. 17-cv-05339-JST, 2019 WL 1766163, at *9 (N.D. Cal. Apr. 22, 2019)

14   ("[O]nce officers have subdued a suspect to the point that there is no longer a threat, it becomes

15   practical to deliberate about the type and degree of force to use in continuing to restrain the

16   suspect.").

17                              iv.      Whether the Defendant Officers' Conduct Meets the Deliberate

18                                       Indifference Standard

19           Because there is a genuine dispute as to whether deliberation was feasible under the

20   circumstances presented in this case, the court cannot conclude on summary judgment that the

21   more demanding purpose-to-harm standard applies.  Applying the standard which is more

22   favorable to plaintiff[21]—i.e., the deliberate indifference standard—the court finds that there are

23

24   _____

     [21]  Given the disputed material facts as to which standard applies with respect to the defendant

25   officers' decision to use force, the court applies the deliberate indifference standard since it is the
     standard more favorable to plaintiff, and if no reasonable jury could conclude based upon the

26   evidence that the conduct meets that lower standard, summary judgment would still be
     appropriate.  *See Garlick*, 167 F. Supp. 3d at 1166 ("Even if the undisputed evidence does not

27   establish as a matter of law which standard applies, however, if upon accepting Plaintiffs' facts as
     true no jury could conclude that the alleged conduct meets the deliberate-indifference standard,

28   then, summary judgment is appropriate.").

genuine factual disputes for the finder of fact to resolve regarding whether the officers displayed deliberate indifference in their use of force.  Conflicting evidence on summary judgment, such as the initial need for the deployment of the beanbag and 40mm rounds, opportunities to use lesser force, and the continued use of force on the decedent once he fell to the ground, must be weighed by a jury.  *See Scott*, 2023 WL 2504499, at *12 (finding that dueling evidence as to whether force was necessary, if lesser intrusions were available, and if the continued use of force exhibited deliberate indifference required that a jury to resolve the plaintiff's Fourteenth Amendment claim).

Defendants do not argue that there was no clearly established law that would have put the defendant officers on notice that their conduct would have violated plaintiff's substantive due process rights.  Instead, they merely argue that, under the purpose to harm standard, plaintiff cannot show that they violated the Fourteenth Amendment.  (Doc. Nos. 44-1 at 14–15; 45-1 at 18.)  Because defendants' arguments rely on disputed issues of material fact which must be resolved by the trier of fact, they are not entitled to summary judgment on qualified immunity grounds with regard to plaintiff's Fourteenth Amendment claim, except to the extent that this claim is based on defendant Tsverov's use of his taser before the decedent fell to the ground.

For the reasons explained above, the court will deny summary judgment in defendants Pinola, Simpson, Lindner, Espinoza, Swaleh, Finnecum, and Helmich's favor as to plaintiff's denial of familial relationship claim brought under the Fourteenth Amendment.  The court will also deny summary judgment in defendant Tsverov's favor as to this claim, except to the extent that the claim is based on Tsverov's first deployment of his taser prior to decedent falling to the ground.

3.    Supervisory Liability

There is no evidence before the court on summary judgment that defendant Hunkapiller directly used any force on decedent Zenka.  Rather, plaintiff's claims against him appear to be based solely on a theory of supervisory liability.

"A supervisory official is liable under § 1983 so long as 'there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection

45

between the supervisor's wrongful conduct and the constitutional violation.'" *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018) (citation omitted); *Browder*, 929 F.3d at 1141 n.14 (same). "The requisite causal connection can be established . . . by setting in motion a series of acts by others or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *Rodriguez*, 891 F.3d at 798 (quoting *Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011)). Accordingly, "a supervisor may be liable in his individual capacity 'for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others.'" *Id.* (citation omitted).

Here, defendant Hunkapiller created the tactical plan involving the deployment of the contact team and their use of the beanbag and 40mm launchers. The court finds that plaintiff has come forward with sufficient evidence to create a genuine issue of material fact as to whether defendant Hunkapiller knew or should have known that his actions would cause officers to use excessive force and deprive plaintiff of her familial relationship with decedent Zenka. *See Roderick*, 126 F.3d at 1204 (holding that FBI supervisors could be liable for a shooting where they developed a plan that resulted in the shooting); *Rodriguez*, 891 F.3d at 798 (holding that there was a basis for supervisory liability for the supervisory defendants who "were personally present and directed the deputies' use of force against appellees").

At the time of the incident in question, it had long been clearly established that a supervisor can be held liable for the actions of subordinates if they "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998). The court, therefore, concludes that defendant Hunkapiller is not entitled to summary judgment on qualified immunity grounds, and will therefore deny the city defendants' motion for summary judgment as to plaintiff's Fourth and Fourteenth Amendment claims brought against him.

/////

1       4.      Failure to Train: Municipal Liability

2       The City moves for summary judgment on plaintiff's *Monell* claim for failure to

3 adequately train its officers. (Doc. No. 44-1 at 15–16.)

4       Under § 1983, local governments can be sued for constitutional deprivations caused by

5 governmental policy or custom. *Monell*, 436 U.S. at 690. *Respondeat superior* liability,

6 however, does not apply. *Id.* at 691. While a local government's failure to adequately train its

7 employees can amount to official government policy for purposes of § 1983 "in limited

8 circumstances," "[a] municipality's culpability for a deprivation of rights is at its most tenuous

9 where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "[A]

10 municipality's failure to train its employees in a relevant respect must amount to 'deliberate

11 indifference to the rights of persons with whom the [untrained employees] come into contact.'"

12 *Connick*, 563 U.S. at 61 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "A pattern

13 of similar constitutional violations," rather than proof of a single incident, is "'ordinarily

14 necessary' to demonstrate deliberate indifference." *Id.* at 62–63 (citations omitted). Yet, single-

15 incident liability may exist in those rare cases where "the unconstitutional consequences of failing

16 to train" are "patently obvious." *Id.* at 63–64. Negligent training, by itself, is insufficient to

17 support a *Monell* claim. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

18       As an initial matter, plaintiff acknowledges in her opposition that the City has a policy

19 mandating that tasers should not be deployed when the subject no longer poses an imminent

20 threat of serious bodily injury or death, and that using tasers on a passive subject during incidents

21 of passive resistance is not permitted. (Doc. No. 48 at 28.) Plaintiff argues that because

22 defendant Tsverov did not properly comply with the City's taser policy, and that defendant

23 Hunkapiller directed defendant Tsverov to deploy the taser in violation of the policy, there is "a

24 genuine dispute of fact as to whether the City provided adequate training to its officers regarding

25 the use of tasers under its own policy on taser use." (*Id.*)

26       Similarly, plaintiff argues that "[t]he officers' failures to verbally warn Zenka before using

27 force against him, failures to form and communicate a tactical plan, failure to take Zenka safely

28 into custody, and failures to de-escalate a situation involving a mentally disturbed individual also

1    indicate that the City failed to properly train its officers on these issues." (*Id.*)  However, the

2    court notes that it is undisputed here that officers are trained to give warnings before using less-

3    lethal or deadly force when feasible and are also trained to de-escalate situations when dealing

4    with an individual experiencing a mental health crisis.

5           The court finds that plaintiff's argument—that the officers' failure to comply with the

6    City's policies means their training was inadequate—is foreclosed by binding Supreme Court

7    authority.  In this regard, that court has held:

8                 Neither will it suffice to prove that an injury or accident could have
                  been avoided if an officer had had better or more training, sufficient
9                 to equip him to avoid the particular injury-causing conduct.  Such a
                  claim could be made about almost any encounter resulting in injury,
10                yet not condemn the adequacy of the program to enable officers to
                  respond properly to the usual and recurring situations with which
11                they must deal.  And plainly, adequately trained officers occasionally
                  make mistakes; the fact that they do says little about the training
12                program or the legal basis for holding the city liable.

13   *Harris,* 489 U.S. at 390–391; *see also Gonzalez v. City of Phoenix*, No. 21-cv-01340-MTL-DMF,

14   2024 WL 1195512, at *22 (D. Ariz. Mar. 20, 2024) (rejecting a similar theory of liability

15   advanced by a plaintiff as foreclosed by the Supreme Court's decision in *Harris*).

16          Furthermore, plaintiff has not pointed to any evidence before the court on summary

17   judgment indicating a pattern of similar incidents by untrained officers that resulted in the

18   outcome here.  To establish a question of fact regarding municipal liability, plaintiff needs to

19   show that the unconstitutional consequences of failing to train officers on these issues were

20   "patently obvious."  *Connick*, 563 U.S. at 64.  She has failed to do so.

21          Accordingly, summary judgment will be granted in favor of the City as to plaintiff's

22   *Monell* claim based on a failure to train its officers.

23   **B.    State Law Claims**

24          In addition to her federal claims, plaintiff, as successor in interest to decedent Zenka and

25   on her own behalf, present the following state law claims in her SAC:  wrongful death and survival

26   based on battery; wrongful death and survival based on negligence; and violation of the Bane Act.

27   (Doc. No. 21.)  Defendants move for summary judgment in their favor on each of plaintiff's state

28   law claims.  (Doc. Nos. 44-1 at 16–20; 45-1 at 22–23.)

1          1.      State Law Immunities

2                  a.      *Defendants City and State*

3          In their respective motions for summary judgment, the City and State both argue that they

4   are entitled to immunity from plaintiff's state law claims.  However, under California law, "[a]

5   public entity, as the employer, is generally liable for the torts of an employee committed within

6   the scope of employment if the employee is liable."  *Thomas v. City of Richmond*, 9 Cal. 4th

7   1154, 1157 (1995); *see also* Cal. Gov't Code § 815.2.  Defendants do not argue or present any

8   evidence establishing that the defendant officers' actions were not within the scope of their

9   employment for the City and the State.  Thus, the City and State are not entitled to summary

10  judgment on plaintiff's state law tort claims to the extent the court finds that their employees are

11  not entitled to summary judgment on those claims.  *See Huerta v. Cnty. of Tulare*, No. 1:17-cv-

12  01446-EPG, 2024 WL 871729, at *14 n.20 (E.D. Cal. Feb. 28, 2024).

13                 b.      *Defendant Simpson*

14         Defendant Simpson contends that he is entitled to immunity as to plaintiff's state law

15  claims under California Penal Code §§ 196 and 835a and California Government Code § 820.2.

16  (Doc. No. 45-1 at 22–23.)

17         California Penal Code § 196 provides a privilege for justifiable homicide.  "Under Penal

18  Code section 196, a police officer who kills someone has committed a justifiable homicide if the

19  homicide was necessarily committed in overcoming actual resistance to the execution of some

20  legal process, or in the discharge of any other legal duty . . . . There can be no civil liability under

21  California law as the result of a justifiable homicide."  *Martinez v. Cnty. of Los Angeles*, 47 Cal.

22  App. 4th 334, 349–50 (1996) (citations omitted).  "The test for determining whether a homicide

23  was justifiable under Penal Code section 196 is whether the circumstances 'reasonably create[d] a

24  fear of death or serious bodily harm to the officer or to another.'"  *Id.* at 349 (citations omitted).

25  California courts have held that when the officers' conduct is reasonable for purposes of the

26  Fourth Amendment, that conduct is also reasonable under California Penal Code § 196.  *Id.* at

27  349–50.

28  /////

49

1    California Penal Code § 835a likewise permits police officers to use "reasonable force to

2    effect [an] arrest" and therefore turns on the reasonableness of the officer's actions.  *See, e.g.,*

3    *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272–73 (1998) (noting "police battery actions

4    recognize[ ]" § 835a's protections by requiring a plaintiff to "prove[ ] unreasonable force was

5    used").

6        Based on the same reasoning set forth above, the court concludes that genuine disputes of

7    material fact prevent the court from finding defendant Simpson immune under California Penal

8    Code §§ 196 and 835a and entitled to summary judgment on that basis.  *See, e.g., Brown v.*

9    *Grinder*, No. 2:13-cv-01007-KJM-KJN, 2019 WL 280296, at *25 (E.D. Cal. Jan. 22, 2019)

10   ("[F]or the same reasons the court cannot rule as a matter of law in defendants' favor on

11   plaintiffs' Fourth Amendment excessive force claim or plaintiffs' substantive due process claim,

12   the court concludes genuine disputes of material fact preclude finding defendants are immune

13   under California Penal Code sections 196 and 835a."); *Mitchell v. City of Pittsburg*, No. 09-cv-

14   00794-SI, 2013 WL 5487816, at *12 (N.D. Cal. Oct. 1, 2013) (rejecting on summary judgment

15   defendants' § 196 immunity argument where a reasonable jury could find that the officer used

16   excessive force in shooting the decedent); *Barragan v. City of Eureka*, No. 15-cv-02070-WHO,

17   2016 WL 4549130, at *6 (N.D. Cal. Sept. 1, 2016) (denying summary judgment on the basis of

18   § 835a because a genuine dispute of material fact remained as to whether defendant used

19   reasonable force against plaintiff).

20       Defendant Simpson also contends that California Government Code § 820.2 affords him

21   immunity and that summary judgment in his favor should be granted on that ground.  (Doc. No.

22   45-1 at 22.)  This section, however, only applies to policy decisions that involve "deliberate and

23   considered policy decisions," not to operational decisions made by the police purporting to

24   enforce the law.  *Caldwell v. Montoya*, 10 Cal. 4th 972, 981–82 (1995) (citations omitted); *see*

25   *also Sharp v. Cnty. of Orange*, 871 F.3d 901, 920 (9th Cir. 2017) (observing as matter of law that

26   § 820.2 immunity "does not apply to an officer's decision to detain or arrest a suspect" and

27   "covers only 'policy' decisions made by a 'coordinate branch[ ] of government,' not 'operational

28   decision[s] by the police purporting to apply the law'") (citations omitted); *Conway v. Cnty. of*

1  *Tuolumne*, 231 Cal. App. 4th 1005, 1015 (2014) (noting "courts have determined discretionary

2  immunity does not apply to . . . using unreasonable force when making an arrest or overcoming

3  resistance to it").  Therefore, § 820.2 does not afford the officers immunity under the

4  circumstances present here and summary judgment on that ground will be denied.

5     2. <u>Wrongful Death & Survival Claims</u>

6     A wrongful death cause of action requires (1) a wrongful act or negligence, (2) which

7  causes (3) the death of another person.  *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 390 (1999).

8  Here, with respect to the first element, plaintiff brings her wrongful death claims based on two

9  theories:  (a) battery (seventh claim); and (b) negligence (eighth claim).  (Doc. No. 21.)

10     a. *Battery*

11     A California state law claim for battery is the counterpart of a Fourth Amendment

12  excessive force claim, and the same legal standards apply.  *See Nelson v. City of Davis*, 709 F.

13  Supp. 2d 978, 992 (E.D. Cal. 2010) ("[T]he same standards apply to both state law assault and

14  battery and section 1983 claims premised on constitutionally prohibited excessive force . . . ."),

15  *aff'd*, 685 F.3d 867 (9th Cir. 2012); *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2009) ("A

16  state law battery claim is a counterpart to a federal claim of excessive use of force.").

17     As for defendant Tsverov, the court has already concluded that he is entitled to summary

18  judgment in his favor on plaintiff's excessive force claim to the extent that claim is predicated on

19  Tsverov's use of the taser before the decedent fell to the ground.  The court will likewise grant

20  summary judgment in defendant Tsverov's favor as to plaintiff's wrongful death and survival

21  claim premised on battery based on that same factual predicate.

22     As for the other defendant officers' use of force, and the subsequent use of his taser by

23  defendant Tsverov, as well as defendant Hunkapiller's action in directing and leading several of

24  /////

25  /////

26  /////

27  /////

28  /////

the SPD defendant officers to use less-lethal force against decedent Zenka,[22] the court has already

concluded that defendants' motions for summary judgment as to plaintiff's § 1983 excessive

force claim must be denied.  Therefore, as to those same factual predicates, defendants' motions

for summary judgment on plaintiff's wrongful death and survival claim based on battery will

likewise be denied.

              b.    *Negligence*

With respect to defendant Tsverov's first use of the taser, as discussed above, the court

finds based upon the evidence on summary judgment that this use of force was reasonable as a

matter of law.  As noted, plaintiff's opposition suggests as much and plaintiff's own expert argues

that officers should have user tasers, stating that "[r]ather than using overwhelming less-lethal

force prior to the shooting such as the beanbags and 40mm launchers, the officers should have

utilized tasers, including taser officers in the contact team and tasing Mr. Zenka upon their initial

approach."  (Doc. No. 48-1 at 7.)  Having found no evidence to support plaintiff's negligence

claim against defendant Tsverov for his first application of the taser, the court will grant summary

judgment in defendant Tsverov's favor on plaintiff's wrongful death and survival claim premised

on negligence to the extent that claim is based on defendant Tsverov's first use of his taser.

Furthermore, for the same reasons as discussed above, the court finds that plaintiff has

raised a genuine dispute as to whether the defendant officers' other uses of force, as well as

defendant Hunkapiller's directing officers to use that force, were unreasonable.  Accordingly,

defendants' motions for summary judgment will be denied with respect to plaintiff's wrongful

death and survival claim based on negligence, except to the extent that the claim is predicated on

---

[22]  The parties did not specifically brief the issue of defendant Hunkapiller's potential liability for battery and the Bane Act as a supervisor who did not himself use any force.  The court notes that while employers, including public entities, are vicariously liable under *respondeat superior* for intentional torts, *see Rodgers v. Kemper Constr. Co.*, 50 Cal. App. 3d 608, 621 (1975), "[t]he doctrine of *respondeat superior* is not applicable to the relationship between a supervisor and his subordinate employees."  *George F. Hillenbrand, Inc. v. Ins. Co. of N. Am.*, 104 Cal. App. 4th 784, 823 (2002) (quoting *Malloy v. Fong*, 37 Cal. 2d 356, 378 (1951)).  However, here, plaintiff does not rely on a theory of vicarious liability.  Instead, evidence has been presented on summary judgment from which a reasonable jury could find that defendant Hunkapiller directed and led the officers in using force on decedent Zenka.  *See Rodriguez*, 891 F.3d at 799.

1    defendant Tsverov's use of the taser on decedent Zenka before he fell to the ground.  *See Young*,

2    655 F.3d at 1170 ("[T]he Fourth Amendment violation . . . also suffices to establish the breach of

3    a duty of care under California law.").

4              3.     Bane Act

5              The Bane Act provides a right of action to "[a]ny individual whose exercise or enjoyment

6    of rights secured by the Constitution or laws of the United States, or of rights secured by the

7    Constitution or laws of [California] has been interfered with" by another person's "threats,

8    intimidation, or coercion."  Cal. Civ. Code § 52.1(b)–(c).  To prevail on a claim for violation of

9    the Bane Act, a plaintiff must show "a specific intent to violate the arrestee's right to freedom

10   from unreasonable seizure."  *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018)

11   (citing *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th, 766, 801 (2017)).  A "mere

12   intention to use force that the jury ultimately finds unreasonable—that is, general criminal

13   intent—is insufficient."  *Id.* at 1045 (quoting *United States v. Reese*, 2 F.3d 870, 885 (9th Cir.

14   1993)).  Instead, "the jury must find that the defendants intended not only the force, but its

15   unreasonableness, its character as more than necessary under the circumstances."  *Id.* (internal

16   quotations omitted).  However, it is not necessary for defendants "to have been thinking in

17   constitutional or *legal terms* at the time of the incidents, because a reckless disregard for a

18   person's constitutional rights is evidence of a specific intent to deprive that person of those

19   rights."  *Id.* (internal quotations omitted).

20             The inquiry into specific intent focuses on:  (1) whether "the right at issue [was] clearly

21   delineated and plainly applicable under the circumstances of the case" and (2) whether the

22   "defendant commit[ed] the act in question with the particular purpose of depriving the citizen

23   victim of his enjoyment of the interests protected by that right[.]"  *Sandoval v. Cnty. of Sonoma*,

24   912 F.3d 509, 520 (9th Cir. 2018) (citation omitted).  If both requirements are met, "specific

25   intent can be shown 'even if the defendant did not in fact recognize the unlawfulness of his act'

26   but instead acted in 'reckless disregard' of the constitutional right."  *Id.* (quoting *Cornell*, 17 Cal.

27   App. 5th at 803).

28   /////

                                                        53

1    Here, the city defendants argue that they are entitled to summary judgment in their favor

2    on plaintiff's Bane Act claim because there is no evidence before the court on summary judgment

3    that the defendant officers possessed the requisite "specific intent" to violate plaintiff's rights.

4    (Doc. No 44-1 at 20.)  The court finds this argument to be unpersuasive.

5    Plaintiff's claim against defendants for violation of the Bane Act is based on the same

6    alleged facts as her claim for excessive force in violation of the Fourth Amendment.  The court

7    has concluded that, viewing the evidence in the light most favorable to plaintiff, a reasonable

8    juror could conclude that the defendant officers acted unreasonably under the Fourth Amendment

9    when they used force on the decedent.  From the same evidence, a reasonable juror could

10   conclude that the defendant officers acted in reckless disregard for plaintiff's rights.  *See Taylor v.*

11   *Cnty. of Calaveras*, No. 1:18-cv-00760-BAM, 2020 WL 7406527, at *17 (E.D. Cal. Dec. 17,

12   2020) ("Because Plaintiffs' Bane Act claims are, at a minimum, predicated on the same facts as

13   the unlawful entry, arrest and excessive force claims, and genuine disputes of fact exist with

14   respect to those claims, summary judgment cannot be granted.") (internal citation omitted); *Est.*

15   *of Smith v. Holslag*, No. 16-cv-02989-WQH-MSB, 2020 WL 7863428, at *11 (S.D. Cal. Dec. 31,

16   2020) (finding that because the Bane Act claim was based on the same facts as the Fourth

17   Amendment claim, and because the court had already found that a reasonable juror could

18   conclude that the defendant officer acted unreasonably under the Fourth Amendment when he

19   shot and killed the decedent, a reasonable juror could also conclude from those same facts that the

20   defendant officer acted in reckless disregard of the decedent's rights), *aff'd sub nom. Est. of Smith*

21   *by Smith v. Holslag*, No. 21-55073, 2022 WL 1224001 (9th Cir. Apr. 26, 2022).

22   Accordingly, defendants' motions for summary judgment in their favor with respect to

23   plaintiff's Bane Act claim will be denied, except to the extent it is based on defendant Tsverov's

24   first use of his taser on the decedent before the decedent had fallen to the ground.  Only as to this

25   latter basis of plaintiff's Bane Act claim will summary judgment be granted in favor of defendant

26   Tsverov.

27   /////

28   /////

**CONCLUSION**

For the reasons explained above,

1.    The city and state defendants' objections (Doc. Nos. 52-1 at 66, 73–76; 53 at 12–16) to certain parts of Roger Clark's declaration (Doc. No. 48-1) are overruled;

2.    The city defendants' objections to other portions of plaintiff's statement of additional material facts (Doc. No. 52-1 at 38, 39, 55) are overruled;

3.    The city defendants' motion for partial summary judgment (Doc. No. 44) is granted in part and denied in part as follows:

    a.    The city defendants' motion for summary judgment in their favor as to plaintiff's first claim for excessive force in violation of the Fourth Amendment brought under 42 U.S.C. § 1983 against defendant Tsverov is granted to the extent that claim is predicated on defendant Tsverov's first deployment of the taser before the decedent had fallen to the ground;

    b.    The city defendants' motion for summary judgment in their favor as to plaintiff's third claim for a violation of substantive due process under the Fourteenth Amendment brought pursuant to 42 U.S.C. § 1983 against defendant Tsverov is granted to the extent that the claim is predicated on defendant Tsverov's first deployment of the taser before the decedent had fallen to the ground;

    c.    The city defendants' motion for summary judgment in their favor as to plaintiff's sixth claim against defendant City, brought as a § 1983 *Monell* claim for failure to train, is granted;

    d.    The city defendants' motion for summary judgment in their favor as to plaintiff's state law claims against defendant Tsverov and the City is granted only to the extent those claims are predicated on defendant Tsverov's first deployment of the taser before the decedent had fallen to the ground;

    e.    The city defendants' motion is otherwise denied;

4.      The state defendants' motion for partial summary judgment (Doc. No. 45) is

denied;

5.      If the parties intend to dismiss plaintiff's second, fourth, and fifth claims of her

second amended complaint pursuant to agreement, they shall file a stipulation

doing so within twenty-one (21) days of the docketing of this order.  However, if

plaintiff elects not to dismiss those claims, she shall file a notice within twenty-one

(21) days of the docketing of this order indicating her intention to proceed on those

claims;

6.      DOES 9–10 are dismissed from this action; and

7.      The parties are directed to meet and confer on their availability, and within

fourteen (14) days of the docketing of this order, to contact Courtroom Deputy

Pete Buzo at (916) 930-4016 or pbuzo@caed.uscourts.gov with several proposed

dates for the rescheduling of a Final Pretrial Conference and Jury Trial in this

action.

IT IS SO ORDERED.

Dated:   **August 15, 2024**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE

56