1   Rob Bonta, State Bar No. 202668
    Attorney General of California
2   Norman D. Morrison, State Bar No. 212090
    Supervising Deputy Attorney General
3   Diana Esquivel, State Bar No. 202954
    Deputy Attorney General
4     1300 I Street, Suite 125
      P.O. Box 944255
5     Sacramento, CA 94244-2550
      Telephone:  (916) 210-7320
6     Facsimile:  (916) 322-8288
      E-mail:  Diana.Esquivel@doj.ca.gov
7   *Attorneys for Defendants State of California, by and
    through the California Highway Patrol, and Michael*
8   *Simpson*

9               IN THE UNITED STATES DISTRICT COURT

10             FOR THE EASTERN DISTRICT OF CALIFORNIA

11                    SACRAMENTO DIVISION

12

| | |
|---|---|
| 13 **MARY ELLEN LENNOX,** | No. 2:21-cv-02075 DAD-CSK |
| 14 Plaintiff, | **STATE DEFENDANTS' MOTION IN** |
| 15 | **LIMINE NO. 1 TO PRECLUDE** |
| | **WITNESSES FROM TESTIFYING OR** |
| 16 v. | **OPINING ABOUT THE CAUSE OF** |
| | **DECEDENT'S MENTAL STATUS;** |
| 17 **CITY OF SACRAMENTO, et al.,** | **SUPPORTING DECLARATION** |
| 18 Defendants. | Trial:        February 18, 2025 |
| 19 | Time:        9:00 a.m. |
| | Courtroom:   4 (15th Floor) |
| 20 | Judge:        Hon. Dale A. Drozd |
| | Action Filed:  August 26, 2021 |

21

22                          **INTRODUCTION**

23        Defendants State of California, by and through the California Highway Patrol, and Michael

24   Simpson (State Defendants) move, under Federal Rules of Evidence 401, 402, 403, and 702 to

25   preclude any witness and counsel from testifying, opining, or arguing that decedent Jordan

26   Zenka's mental crisis or behavior during the subject incident was due to mental illness. Plaintiff

27   has not designated any medical or mental-health expert to opine about Zenka's mental health

28   during the incident or the cause for his behavior. The parties' and witnesses' testimony should be

                                              1

1  limited to their observations, but they are not qualified to opine as to the cause of Zenka's

2  behavior.

3  **ARGUMENT**

4      Federal Rule of Evidence 402 provides that all relevant evidence is admissible and evidence

5  that is not relevant is inadmissible. Fed. R. Evid. 402. Relevant evidence is "evidence having any

6  tendency to make the existence of any fact that is of consequence to the determination of the

7  action more probable or less probable than it would be without the evidence." Fed. R. Evid.

8  401(a). Relevant evidence may be excluded if it will cause prejudice, undue delay, a waste of

9  time, or a needless presentation of cumulative evidence in the discretion of the court. Fed. R.

10  Evid. 403; *Obrey v. Johnson*, 440 F.3d 691, 698 (9th Cir. 2005).

11      Opinions about causation, diagnosis, and prognosis can only be rendered on the basis of

12  specialized knowledge held by an expert qualified by medical education, experience and training.

13  Fed. R. Evid. 701, 702. The Ninth Circuit recognizes that lay witnesses may not provide any

14  medical diagnosis because "medical diagnoses are beyond the competence of lay witnesses to

15  make." *Tobeler v. Colvin*, 2014 WL 1509018, *at 2 (9th Cir. Apr. 18, 2014) (quoting Nguyen v.

16  Chater, 100 F.3d 1462, 1467 (9th Cir.1996) (internal quotation marks omitted)). Similarly, in the

17  mental health context, courts have generally found that lay witnesses may not testify to the mental

18  health diagnosis of another person when such testimony would necessarily rely on scientific,

19  technical, or other specialized knowledge. *Crawford v. Cty. of Bakersfield*, 944 F.3d 1070, 1079

20  (9th Cir. 2019) ("[S]o long as [lay witness] stopped short of opining that [another person] had a

21  mental illness, she was competent to testify about her own observations of and experiences with

22  [that person]."), citing *Frisone v. U.S.*, 270 F.2d 401, 403 (9th Cir. 1959) (distinguishing between

23  a witness's admissible lay testimony "as to his faulty recollection and poor memory" and

24  inadmissible "testimony as to the existence or treatment of a mental illness serious enough to

25  cause permanent memory impairment," and noting that "only expert testimony will be allowed on

26  technical questions of causation").

27      State Defendants anticipate Plaintiff's counsel to argue to the jury or attempt to elicit

28  testimony from the Defendant officers and expert witnesses that Zenka was experiencing a mental

2

1    health crisis or mental illness as an explanation for Zenka's behavior during the subject incident.

2    No witness listed in the Final Pretrial Order is qualified to offer an opinion that Zenka's behavior

3    was caused by or due to mental illness. Plaintiff is entitled to inquire about the Defendant

4    officers' own perceptions of Zenka's bizarre, abnormal, or incoherent behavior and whether such

5    perceptions led them to believe that Zenka *could* be experiencing a mental crisis, as such

6    evidence is relevant to determining whether the force used was reasonable. However, Plaintiff

7    cannot then argue to the jury or ask any lay witness to conclude that Zenka's behavior was in fact

8    caused by or due to mental illness.[1]

9        Plaintiff did not produce any evidence during discovery that Zenka suffered from mental

10    illness. Both Plaintiff and Zenka's partner, George Cardenas, testified at deposition that they were

11    unaware of Zenka having or suffering from mental-health issues. (Lennox Dep. 27:4-28:1, 33:25-

12    34:4, 36:15-19, attached as Ex. A to Esquivel Decl.; Cardenas Dep. 47:1-19, attached as Ex. B to

13    Esquivel Decl.) Approximately three months before the subject incident, Zenka denied any

14    history of mental health issues. (PLTF 0068, 0069, attached as Ex. C to Esquivel Decl.) Further,

15    Plaintiff did not designate any expert witness qualified to opine on Zenka's mental health or state

16    of mind during the incident, including whether he was in mental-health crisis or his behavior was

17    caused by mental illness. (*See* Pl.'s Initial Expert Disclosures, attached as Ex. A to State Defs.'

18    Mot. in Limine No. 8.)

19    ///

20    ///

21    ///

22    ///

23

24

25

26    _____

27    [1] This motion is related to State Defendant's motion concerning the admissibility of the
toxicology report because whether Zenka's behavior was due to being under the influence of a
drug such as methamphetamine or to mental illness is relevant to determining whether the force

28    used in this instance was reasonable.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the reasons stated above, the Court should preclude Plaintiff from offering opinions or argument about the cause of Zenka's behavior or mental status during the subject incident, including eliciting such opinions from Defendants, lay witnesses, and her expert witness, Roger Clark.

Dated:  January 28, 2025                                        Respectfully submitted,

ROB BONTA
Attorney General of California
NORMAN D. MORRISON
Supervising Deputy Attorney General

*/s/ Diana Esquivel*

DIANA ESQUIVEL
Deputy Attorney General
*Attorneys for Defendants State of Cal. and Simpson*

SA2021305171
38743837.docx

State Defendants' MIL No. 1 re Exclude Opinions of the Cause of Decedent's Mental Status
(2:21-cv-02075-DAD-CSK)

1

### DECLARATION OF DIANA ESQUIVEL

2        I, Diana Esquivel, declare:

3        1.  I am admitted to practice law in California and before this Court, and am a Deputy

4    Attorney General with the Office of the Attorney General for the State of California, attorneys of

5    record for Defendants State of California, by and through the California Highway Patrol (CHP),

6    and Michael Simpson (State Defendants).

7        2.  As required in the Court's Standing Order, the parties meet and conferred on the issues

8    presented in this motion as well as the other issues the parties identified as matters that would be

9    subject to motions in limine. On January 24, 2025, I sent all counsel a detailed e-mail, listing the

10   factual and legal basis for the motions the State Defendants intended to file. The same day,

11   Plaintiff's counsel provided the basis for their intended motions. I immediately responded to

12   Plaintiff's e-mail with the State Defendants' tentative position on those issues. Over the course of

13   the following days, the parties exchanged additional e-mails concerning their position on certain

14   issues. On January 28, 2025, counsel had a conference call and reached agreement on several

15   issues that are the subject of a stipulation that is being filed with the Court under separate cover.

16   The parties were unable to agree on other issues, including the subject matter addressed in this

17   motion in limine.

18       3.  Exhibit A are excerpts of the relevant portions of the transcript of Plaintiff Mary

19   Lennox's deposition testimony, taken on February 9, 2023, in this matter.

20       4.  Exhibit B are excerpts of the relevant portions of the transcript of George Cardenas'

21   deposition testimony, taken on May 17, 2023, in this matter.

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27

28

1          5.  Exhibit C is a true and correct copy of Zenka's September 3, 2020 Care Plan from

2   Pacific Crest Trail Detox LLC.

3          I declare under penalty of perjury under the laws of the United States and the State of

4   California that the foregoing statements are true and correct.

5

6   Dated:  January 28, 2025                         ____*/s/ Diana Esquivel*____
                                                      Diana Esquivel
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

State Defendants' MIL No. 1 re Exclude Opinions of the Cause of Decedent's Mental Status
(2:21-cv-02075-DAD-CSK)

# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION


MARY ELLEN LENNOX,              )
                                )
            Plaintiff,          )  Case No. 2:21-cv-02075 DAD-KJN
                                )
vs.                             )
                                )
CITY OF SACRAMENTO, et al.,     )
                                )
            Defendants.         )
_____


DEPOSITION OF
MARY ELLEN LENNOX
FEBRUARY 9, 2023

THROUGH REMOTE AUDIO/VISUAL TRANSMISSION


REPORTED BY:  AMY JO TREVINO, CSR #5296

 1 | Objection, relevance.  You can answer.

 2 |         THE WITNESS:  No.

 3 |         MS. ESQUIVEL:

 4 |   Q    At anytime during his high school years did you ever

 5 | suspect that Jordan might have been having some mental health

 6 | issues?

 7 |   A    No.

 8 |         MS. BAGDASSARIAN:  Lacks foundation.  Calls for

 9 | speculation.  You can answer if you know.

10 |         THE WITNESS:  No.  The answer is no.

11 |         MS. ESQUIVEL:

12 |   Q    At anytime during his high school years did he, did he

13 | ever participate in any kind of school counseling to deal with

14 | either emotional or mental health issues?

15 |         MS. BAGDASSARIAN:  Objection, calls for speculation.

16 | Lacks foundation.  You can answer if you know.

17 |         THE WITNESS:  No.

18 |         MS. ESQUIVEL:

19 |   Q    During his high school years did he ever ask you to

20 | provide him with counseling for either emotional or mental

21 | health issues?

22 |   A    No.

23 |   Q    During his high school years do you know if he ever

24 | went to his father and asked to get counseling for any

25 | emotional or mental health issues?

1   A     Not to my knowledge.

2   Q     Did Jordan graduate from high school?

3   A     Yes.

4   Q     Did he continue his education after high school?

5   A     Yes.

6   Q     Where did he attend after high school?

7   A     The technical college called Crimson Aviation Academy.

8   Although I think it has since been sold and changed its name.

9   Q     Do you know what he was studying or what trade he was

10  engaging in at Crimson?

11  A     Yes.  Aviation maintenance.

12  Q     Before Aden -- before Jordan started Crimson, did you

13  ever discuss with him if he was going to attend either a

14  university or a junior college as opposed to a trade school?

15  A     Yes.

16  Q     Did he ever tell you why he chose not to continue his

17  education in a junior college or other university?

18        MS. BAGDASSARIAN:  Objection, relevance.  You can

19  answer if you know.

20        THE WITNESS:  Yes.

21        MS. ESQUIVEL:

22  Q     And what did he tell you?

23  A     Jordan really liked working with his hands.  He really

24  liked problem solving and needed to be engaged mentally.  He

25  didn't find sitting in a classroom just being lectured at

1          MS. ESQUIVEL:  Let's go back on the record.

2     Q    Do you know to the best of your recollection how long

3  did Jordan live in that studio apartment in Redondo Beach?

4     A    To the best of my recollection six to seven months.

5     Q    And during that time period did you provide him any

6  financial assistance for his household needs?

7     A    No.

8     Q    Do you know if Dan provided Jordan with any financial

9  assistance?

10     A    I don't know.

11     Q    Do you know if Jordan was still seeing Rick during

12  that time that he lived in the studio apartment?

13     A    I don't know.

14     Q    During the time that Jordan was living in the studio

15  apartment for six to seven months were you still in California

16  or had you moved back to Oregon?

17     A    I had moved back to Oregon shortly after he got the

18  lease and moved in.

19     Q    During that period that he was still living in the

20  studio apartment how frequently did you have communication with

21  Jordan?

22     A    At least weekly.

23     Q    Telephone, is that how you --

24     A    Usually, uh-huh.

25     Q    And did he ever during that time period, that six to

1   seven-month time period that he was living in the studio

2   apartment, did he ever convey to you that he was having

3   emotional or mental health issues?

4       A    No.

5       Q    Did he ever talk to you about anyone he might have

6   been romantically involved with?

7       A    No.

8       Q    Did he ever talk to you about any of the friends that

9   he was hanging out with?

10      A    No.

11      Q    During this time, the six to seven-month period, where

12  was Aden living?

13      A    Some of it with his dad until I was set up to have him

14  come to Oregon.

15      Q    During the six to seven-month period that Jordan had

16  his own apartment, did he visit you in Oregon?

17      A    No.

18      Q    During that whole period that he was, that he had his

19  own apartment, did he continue working for Uber and Lyft?

20      A    To my knowledge yes.

21      Q    So after the six to seven-month period, where did

22  Jordan go after that?

23      A    He came to live with me in Oregon.

24      Q    Was this after his father passed away?

25      A    Yes.

1        MS. ESQUIVEL:

2    Q    On either side of the family, either Dan's or your's,

3    did you have any nephews or nieces that were in close age to

4    Jordan?

5    A    Yes.

6    Q    How many?

7    A    Well, not that close, probably about ten years apart.

8    There were a handful of them.  Nobody his age.

9    Q    Were the nephews or nieces elder?

10   A    Yes.

11   Q    Okay.  And as far as you know Jordan never fathered

12   any children?

13   A    Correct, as far as I know he never fathered any

14   children.

15   Q    During the 2016, September 2016 to September 2020

16   period that Jordan lived on and off with you in Oregon,

17   Sherwood, Oregon, do you recall him ever telling you that he

18   was having emotional or mental health issues?

19   A    No.

20   Q    Did he ever tell you that he was having problems with

21   substance abuse or alcohol abuse?

22   A    We discussed it.

23   Q    What do you mean by you discussed it?

24   A    As his mom I was concerned, and so I would try to talk

25   to him about getting sober.

```
 1   STATE OF CALIFORNIA      )
                              )  ss.
 2   SACRAMENTO COUNTY        )

 3           I, AMY JO TREVINO, a Certified Court Reporter in and

 4   for Sacramento County, State of California, do hereby certify;

 5           That on Thursday, February 9, 2023, at the hour of 1:30

 6   P.M. of said day, through audio visual transmission appeared

 7   MARY ELLEN LENNOX, who was duly sworn by me to testify the

 8   truth, the whole truth and nothing but the truth, and thereupon

 9   was deposed in the matter entitled herein;

10           That said deposition was taken in verbatim stenotype

11   notes by me and thereafter transcribed into typewriting as

12   herein appears;

13           That the foregoing transcript, consisting of pages 1

14   through 73, is a full, true and correct transcription of my

15   stenotype notes of said deposition.

16           DATED:  This 16th day of February 2023.

17

18

19                        AMY JO TREVINO, CSR #5296

20

21

22

23

24

25
```

# Exhibit B

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION


MARY ELLEN LENNOX,                 )
                                   )
            Plaintiff,             )
                                   )
vs.                                )No. 2:21-cv-02075 DAD-KJN
                                   )
CITY OF SACRAMENTO, et             )
al.,                               )
                                   )
            Defendants.            )
_____)




REMOTE VIDEOCONFERENCE DEPOSITION OF
GEORGE "GEO" CARDENAS

Wednesday, May 17, 2023, at 9:03 a.m.












Reported by:
Alyssa Pacheco
Stenographic Reporter
CA CSR No. 13391

1    Q.  During the four years that you were with Jordan,
2  did you ever -- were you aware if he was receiving any
3  kind of counseling or treatment for any mental health
4  issues?
5    A.  None.
6    Q.  Based on your observations of his behavior, did
7  you ever suspect that Jordan might have had some mental
8  health issues?
9    A.  No.  Not to me, no.
10   Q.  Did Mary ever tell you that Jordan had a mental
11 breakdown?
12   A.  No.  No, she hasn't.
13   Q.  Do you remember telling the officer following
14 Jordan's death that -- that Mary was trying to get him
15 diagnosed for some kind of mental breakdown or mental
16 issues that he was experiencing?
17   A.  I do remember saying it, and I want to say that I
18 have no proof that she was doing it.  I believe I was
19 just very upset at the time.
20   Q.  So when you were -- when you were referencing that
21 his mom was trying to get him -- was trying -- that Mary
22 was trying to get Jordan admitted for a mental --
23 admitted into a hospital for a mental breakdown, was that
24 in reference to the rehabilitation center where he was
25 going to get help for his alcohol consumption, or was it

George (Geo) Cardenas                                     May 17, 2023

```
 1                    REPORTER'S CERTIFICATE

 2          I, ALYSSA PACHECO, do hereby certify that I am a
     licensed Certified Shorthand Reporter, duly qualified and
 3   certified as such by the state of California;
            That prior to being examined, the witness named
 4   in the foregoing deposition was duly sworn by me;
            That the said deposition was recorded
 5   stenographically by me at the time and place herein
     mentioned; and the foregoing pages constitute a full,
 6   true, complete, and correct record of the testimony given
     by the said witness;
 7          That review of the transcript was requested
     pursuant to Federal Rules of Civil Procedure Rule
 8   30(e)(1);
            That I am a disinterested person, not being in
 9   any way interested in the outcome of said action, or
     connected with, nor related to any of the parties in said
10   actions, or to their respective counsel in any manner.

11   DATED: May 30, 2023

12

13                    ALYSSA PACHECO, CSR NO. 13391

14

15

16

17

18

19

20

21

22

23

24

25
```

# Exhibit C

# Jordan Zenka ♂ 2020-269 (Chart Closed)

Birthdate: 02/18/1994
Allergies: Lactose
Admission: 09/03/2020 Care Team

## Stabilization Plan/Care Plan Current 09/03/2020

**Date**            09/03/2020

**PRESENTING
PROBLEM/MEDICAL ISSUE TO BE
ADDRESSED:**

F10.20 Alcohol use disorder, Severe

**Patient Needs to Be Detoxed
from:**

Alcohol

**AS EVIDENCED BY (History and Patient Statement):**

"I'm tired of this, I need help, I need to get sober"


ASAM 6 dimensions for primary substance
Dim 1:

Client reported the following WD sx: Nausea, anxiety, vomiting, sweats. Client reported last EtOH use 9/2/20 in the amount of "Not consistent use, I binge. When I do, I drink multiple bottles of wine and vodka" Client endorsed daily use.

Client's primary substance of choice is Alcohol. Client has been drinking since the age of 16 y/o, and last use 9/2/20 in the amount of "Not consistent use I binge, when I do I drink multiple bottles of wine and vodka." Client reported this use consistent over the past year. Client reports 6 months as his longest period of sobriety. Client reported has had to progressively drink more and more to get the desired effect. The client endorsed 11/11 criteria for substance abuse disorder. disorder.

Dim 2:

Client denied medical concerns/issues.

Client denied sleep apnea.

Client denies hx of Hepatitis B or C.

Client denied hx of eating disorder or seizures.

Client denied needing FMLA/Short term.

Client denied current PCP.

Client denied MRSA/VRE.

Cleint denied all COVID-19 screening questions.

Dim 3:

Client was unsure of family hx of SUD and MH.

Client denied MH dx.

Client denies past history or present concerns with SI, HI or Violence.

Client denied DUI hx

Client endorsed trauma.

Dim 4:

Client reported the following internal motivator that Client reported: "I'm tired of this, I need help, I need to get sober" This writer believes that the quantity that the client has been drinking as well as WD sx experienced may have prompted the client to seek treatment. The client reported the numerous external motivators as evidenced by his responses to the DSM-V criteria questions. This writer believes the client is in the pre-contemplation stage of change, being unable to stop on their own.

Dim 5:

Client reports 6 months as his longest period of sobriety. This client has had no past experience with AA or other 12-step programs. This writer believes that the Client has a limited understanding of his disease, his limited involvement in treatment and living environment puts him at a high risk of relapse.

Dim 6:

Client currently lives with mother/ homeless. Client is currently unemployed. Client's mother is very concerned about the clients alcohol consumption. This writer believes that the Client's support system outside of family members is low per their report.
Recommendations/Additional Comments
This writer recommends admission to DET ASAM 3.7WM based on the six dimensions of ASAM.
Annotations

**Goal:** Patient will be medically stabilized, complete a safe medical detox, follow staff recommendations for ongoing treatment and/or discharge plans, transfer to lower level of care as deemed by treatment team and medical necessity, and begin to engage in the therapeutic group treatment process.

| Objective (What is the Patient going to do?) | Intervention (What is staff going to do?) | Staff Responsible |
| --- | --- | --- |