1   ROB BONTA, State Bar No. 202668
    Attorney General of California
2   NORMAN D. MORRISON, State Bar No. 212090
    Supervising Deputy Attorney General
3   DIANA ESQUIVEL, State Bar No. 202954
    Deputy Attorney General
4     1300 I Street, Suite 125
      P.O. Box 944255
5     Sacramento, CA 94244-2550
      Telephone: (916) 210-7320
6     Facsimile: (916) 322-8288
      E-mail: Diana.Esquivel@doj.ca.gov
7   *Attorneys for Defendants State of California, by and
    through the California Highway Patrol, and Michael*
8   *Simpson*

9                 IN THE UNITED STATES DISTRICT COURT

10              FOR THE EASTERN DISTRICT OF CALIFORNIA

11                      SACRAMENTO DIVISION

12

| | |
|---|---|
| 13  **MARY ELLEN LENNOX,** | No. 2:21-cv-02075 DAD-CSK |
| 14                         Plaintiff, | **STATE DEFENDANTS' MOTION IN LIMINE NO. 2 TO ADMIT EVIDENCE OF DECEDENT'S ALCOHOL ABUSE AND TOXICOLOGY RESULTS; SUPPORTING DECLARATION** |
| 15  v. | |
| 16 | |
| 17  **CITY OF SACRAMENTO, et al.,** | Trial:        February 18, 2025 |
| 18                         Defendants. | Time:         9:00 a.m. |
| 19 | Courtroom:  4 (15th Floor) |
|    | Judge:        Hon. Dale A. Drozd |
| 20 | Action Filed:  August 26, 2021 |

21                      **INTRODUCTION**

22          Defendants State of California, by and through the California Highway Patrol, and Michael

23   Simpson (State Defendants) move to be allowed to introduce evidence and elicit testimony about

24   decedent Jordan Zenka's alcohol abuse and the toxicology report or toxicology results showing

25   the presence of methamphetamine and amphetamine in his system during the subject incident.

26   Evidence of Zenka's alcohol abuse is relevant to Plaintiff's damages for her claims under the

27   Fourteenth Amendment for loss of the familial relationship and wrongful death. Evidence of the

28   presence of drugs in Zenka's system during the subject incident is relevant to the determination

                                      1

1  whether the use of force was reasonable on Plaintiff's Fourth Amendment claim and for purposes

2  of comparative fault on her negligence claim.

3                                    **ARGUMENT**

4         Federal Rule of Evidence 402 provides that all relevant evidence is admissible and evidence

5  that is not relevant is inadmissible. Fed. R. Evid. 402. Relevant evidence is "evidence having any

6  tendency to make the existence of any fact that is of consequence to the determination of the

7  action more probable or less probable than it would be without the evidence." Fed. R. Evid.

8  401(a). Relevant evidence may be excluded if it will cause prejudice, undue delay, a waste of

9  time, or a needless presentation of cumulative evidence in the discretion of the court. Fed. R.

10  Evid. 403; *Obrey v. Johnson*, 440 F.3d 691, 698 (9th Cir. 2005).

11  **I.    EVIDENCE OF ZENKA'S ALCOHOL ABUSE IS RELEVANT TO SHOW THE NATURE AND**
12  **EXTENT OF PLAINTIFF'S RELATIONSHIP AND DAMAGES**

13         Evidence of Zenka's alcohol abuse is relevant to Plaintiff's damages on her state-law

14  claims. In a wrongful death claim, the plaintiff may recover for the loss of the decedent's love,

15  companionship, care, assistance, protection, affection, society, and moral support. (CACI No.

16  3921 (2024).) Evidence of the decedent's drug and alcohol use may be relevant to his relationship

17  the plaintiff, and admissible for the purpose of damages. *Peck v. Cnty. of Orange*, No.

18  CV194654-DSF (AFMx), 2023 WL 11195794, at *5 (C.D. Cal. May 22, 2023); *Estate of Elkins*

19  *v. Pelayo*, No. 1:13-CV-1483 AWI-SAB, 2022 WL 1123117, at *33 (E.D. Cal. Apr. 14, 2022)

20  (noting that the effect of a decedent's drug use on plaintiff is relevant for purposes of damages,

21  "particularly regarding mental anguish and the loss of [decedent's] companionship, comfort,

22  advice, and society").

23         Here, Plaintiff testified at deposition that she asked Zenka to leave the family home because

24  of his drinking and that his drinking affected their relationship in that he could not live with her

25  unless he was sober (Lennox Dep. 13:25-14:9, 59:1-60:22, attached as Ex. D). It is within the

26  common knowledge of the jury the effects alcohol or drug abuse has on relationships. Thus,

27  evidence of Zenka's alcohol use is relevant and admissible.

28

                                           2

## II.    EVIDENCE OF THE PRESENCE OF METHAMPHETAMINE IN ZENKA'S SYSTEM IS RELEVANT TO LIABILITY AND COMPARATIVE FAULT

The Ninth Circuit has emphasized that "where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham* [*v. Connor*, 490 U.S. 386 (1989)], the reasonableness of the force employed." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001); *Glenn v. Washington Cnty.*, 673 F.3d 864, 875-86 (9th Cir. 2011) (noting that the officers should have considered that the decedent was emotionally disturbed when they arrived and found him holding a knife to his own neck); *Vos v. Cty. of Newport*, 892 F.3d 1024, 1034 n.9 ("[O]ur precedent establishes that if officers believe a suspect is mentally ill, they 'should . . . ma[k]e a greater effort to take control of the situation through less intrusive means.'") (citations omitted). In *Crawford v. City of Bakersfield*, 944 F.3d 1070, 1078 (9th Cir. 2019), the Ninth Circuit made clear that facts not known to officer defendants at the time of the conduct giving rise to the plaintiff's claims may be relevant to a determination of liability.

In *Crawford*, evidence that the decedent in fact was mentally ill was relevant to the plaintiff's claim that the defendant officer violated his rights by shooting him:

> The district court abused its discretion, however, in holding that Crawford's proposed testimony was irrelevant on the ground that Stringer, at the time of the shooting, did not know about the past events to which Crawford would have testified. Crawford's testimony regarding Dozer's past behavior and treatment was relevant to whether he was in fact mentally ill at the time. Evidence that Dozer had *previously* behaved in ways consistent with mental illness and had been taken to mental health providers for treatment, makes it more likely that he continued to suffer from mental illness on the day of the shooting. In turn, whether Dozer was *in fact* mentally ill that day is relevant to whether he would have appeared to be mentally ill, and thus to whether Stringer knew or should have known that Dozer was mentally ill; after all, the existence of some underlying fact tends to make it more likely that a person knew or should have known that fact.

*Id.* at 1078-79 (emphasis in original). The Court determined that testimony about decedent's past behaviors and treatment was relevant even if the officer had no knowledge of them. *Id.* at 1079. When the evidence shows a dispute as to what an officer perceived just prior to the use of force, evidence that may support one version of the events over another is relevant and admissible. *Boyd v. Cty. & Cnty. of S.F.*, 576 F.3d 938, 944 (9th Cir. 2009).

3

1   Here, there is a dispute whether Zenka's behavior was due to mental illness or a mental-

2   health crisis as Plaintiff alleged and has advanced throughout this litigation. As discussed in the

3   State Defendants' Motion in Limine No. 1, filed concurrently with this motion, there is no

4   evidence to that Zenka suffered from mental illness before the date of the incident. Several

5   Defendants testified at their depositions that they suspected Zenka was under the influence of

6   drugs, including methamphetamine. (Pinola Dep. 27:6-13, attached as Ex. A; Helmich Dep. 26:4-

7   22, attached as Ex. B; Lindner Dep. 18:25-19:5, attached as Ex. C.) The toxicology report

8   confirms the presence of methamphetamine and amphetamine in Zenka's blood at the time

9   Defendants used against him. As Crawford makes clear, it is of no consequence that that

10  Defendants were unaware of toxicology findings or presence of drugs in Zenka's body at the time

11  they used force against him. The toxicology report and results are relevant and admissible

12  because it supports one version of the events (that he was under the influence of drugs) over

13  another (that he was in a mental health crisis). If a jury determines that Defendants reasonably

14  believed that Zenka's behavior was due to him being under the influence of drugs and not mental

15  illness, a jury may conclude that their use of force, including lethal force, was reasonable.

16  Further, State Defendants are entitled to present evidence in defense of the negligence

17  claims that Zenka's conduct contributed to his injuries and Plaintiff's damages. "California law

18  establishes the general duty of each person to exercise, in his or her activities, reasonable care for

19  the safety of others. *Dix v. Live Nation Ent., Inc.*, 56 Cal. App. 5th 590, 605 (2020), citing Cal.

20  Civ. Code § 1714(a). "Everyone is responsible, not only for the result of his or her willful acts,

21  but also for an injury occasioned to another by his or her want of ordinary care or skill in the

22  management of his or her property or person, except so far as the latter has, willfully or by want

23  of ordinary care, brought the injury upon himself or herself." Cal. Civ. Code § 1714(a).

24  Furthermore, in any action for personal injury, property damage, or wrongful death, "based upon

25  principles of comparative fault, the liability of each defendant for non-economic damages shall be

26  several only and shall not be joint[, and e]ach defendant shall be liable only for the amount of

27  non-economic damages allocated to that defendant in direct proportion to that defendant's

28

1  percentage of fault, and a separate judgment shall be rendered against that defendant for that

2  amount." Cal. Civ. Code § 1431.2.

3      By ingesting illegal narcotics, Zenka gambled that he might have an adverse reaction to

4  them and further risked suffering an altered mental status, including hallucinations and paranoia.

5  A jury is entitled to hear evidence of the presence of illegal drugs in Zenka's blood and determine

6  whether his conduct of ingesting illegal drugs contributed to his and Plaintiff's injuries and

7  damages.

8  **CONCLUSION**

9      For the reasons stated above, the Court should allow the introduction of evidence of

10  Zenka's alcohol abuse and the toxicology report and findings.

11

12  Dated:  January 28, 2025                    Respectfully submitted,

13                                             ROB BONTA
                                               Attorney General of California
14                                             NORMAN D. MORRISON
                                               Supervising Deputy Attorney General
15

16                                             */s/ Diana Esquivel*

17                                             DIANA ESQUIVEL
                                               Deputy Attorney General
18                                             *Attorneys for Defendants State of Cal. and*
                                               *Simpson*
19

20  SA2021305171
    38743837.docx

21

22

23

24

25

26

27

28

1    **DECLARATION OF DIANA ESQUIVEL**

2    I, Diana Esquivel, declare:

3    1.  I am admitted to practice law in California and before this Court, and am a Deputy

4    Attorney General with the Office of the Attorney General for the State of California, attorneys of

5    record for Defendants State of California, by and through the California Highway Patrol (CHP),

6    and Michael Simpson (State Defendants).

7    2.  As required in the Court's Standing Order, the parties meet and conferred on the issues

8    presented in this motion as well as the other issues the parties identified as matters that would be

9    subject to motions in limine. On January 24, 2025, I sent all counsel a detailed e-mail, listing the

10   factual and legal basis for the motions the State Defendants intended to file. The same day,

11   Plaintiff's counsel provided the basis for their intended motions. I immediately responded to

12   Plaintiff's e-mail with the State Defendants' tentative position on those issues. Over the course of

13   the following days, the parties exchanged additional e-mails concerning their position on certain

14   issues. On January 28, 2025, counsel had a conference call and reached agreement on several

15   issues that are the subject of a stipulation that is being filed with the Court under separate cover.

16   The parties were unable to agree on other issues, including the subject matter addressed in this

17   motion in limine.

18   3.  Exhibit A are excerpts of the relevant portions of the transcript of Defendant Michael

19   Pinola's deposition testimony, taken on September 6, 2022, in this matter.

20   4.  Exhibit B are excerpts of the relevant portions of the transcript of Defendant John

21   Helmich's deposition testimony, taken on November 18, 2022, in this matter.

22   5.  Exhibit C are excerpts of the relevant portions of the transcript of Defendant Robert

23   Lindner's deposition testimony, taken on November 16, 2022, in this matter.

24   / / /

25   / / /

26   / / /

27

28

1    6. Exhibit D are excerpts of the relevant portions of the transcript of Plaintiff Mary

2  Lennox's deposition testimony, taken on February 9, 2023, in this matter.

3    I declare under penalty of perjury under the laws of the United States and the State of

4  California that the foregoing statements are true and correct.

5

6  Dated:  January 28, 2025                      ___*/s/ Diana Esquivel*___
7                                                   Diana Esquivel

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF CALIFORNIA

3

4    MARY ELLEN LENNOX, individually and   )
     as successor in interest to decedent  )
5    Jordan Zenka,                          )
                                            )
6                    Plaintiff,             )
                                            )
7                    vs.                    ) Case No.
                                            ) 2:18-CV-02075-TLN-KJN
8    CITY OF SACRAMENTO; STATE OF           )
     CALIFORNIA; MICHAEL PINOLA; ROBERT     )
9    LINDER; MICHAEL G. SIMPSON; TRAVIS     )
     HUNKAPILLER; RUVMIN TSVEROV; ANGEL     )
10   ESPINOZA; JOSEPH SWALEH; JASON         )
     FINNECUM; JOHN HELMICH; and DOES 9-10,)
11   inclusive,                             )
                                            )
12                   Defendants.            )
     _____)

13

14

15

16          REMOTE VIDEOCONFERENCE DEPOSITION OF

17                      MICHAEL PINOLA

18              TUESDAY, SEPTEMBER 6, 2022

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  415824

1          And was that -- that was a sergeant?

2      A.   Yes.

3      Q.   So your recollection is the sergeant asked medical

4  to stage?

5      A.   Yes.

6      Q.   Did you form the impression that who we now know to

7  be Mr. Zenka might be suicidal?

8      A.   I hadn't spoke with Mr. Zenka, but based on is

9  demeanor, it appeared that he was either suffering from some

10  type of mental illness or maybe under the influence of

11  narcotic or alcohol or any --

12      Q.   Or maybe both?

13      A.   Correct.

14      Q.   So did you consider that he may have been in some

15  type of a mental health crisis?

16      A.   I did consider that.

17      Q.   And do you know if the City of Sacramento Police

18  Department has any mental health specialist that they can

19  call in in a situation like this?

20      A.   Yes.  The department has them.

21      Q.   Is there a particular name or department for those

22  individuals?

23      A.   I believe it's called the mental health unit, and at

24  that time of day, I don't know what hours they work.  I don't

25  believe they were available at that time.

```
 1                        CERTIFICATE

 2                            OF

 3           CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5           I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8           That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10           That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12           That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15           Further, that the foregoing is an accurate

16   transcription thereof.

17           I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21           IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  September 6, 2022.

23

24           _____
             Jinna Grace Kim, CSR No. 14151

25
```

# Exhibit B

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF CALIFORNIA

3

4    MARY ELLEN LENNOX, individually and   )
     as successor in interest to decedent  )
5    Jordan Zenka,                         )
                                           )
6                    Plaintiff,            )
                                           )
7                    vs.                   ) Case No.
                                           ) 2:21-CV-02075-TLN-KJN
8    CITY OF SACRAMENTO; STATE OF          )
     CALIFORNIA; MICHAEL PINOLA; ROBERT    )
9    LINDER; MICHAEL G. SIMPSON; TRAVIS    )
     HUNKAPILLER; RUVMIN TSVEROV; ANGEL    )
10   ESPINOZA; JOSEPH SWALEH; JASON        )
     FINNECUM; JOHN HELMICH; and DOES 9-10,)
11   inclusive,                            )
                                           )
12                   Defendants.           )
     _____)

13

14

15

16           REMOTE VIDEOCONFERENCE DEPOSITION OF

17                      JOHN HELMICH

18               FRIDAY, NOVEMBER 18, 2022

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  427232

1      Q.    Were you aware that there were officers positioned

2    to the south of the store?

3      A.    Yes, ma'am.

4      Q.    Throughout the incident did you observe anything

5    that made you believe that Mr. Zenka was experiencing a

6    mental health crisis?

7      A.    Based on his behaviors I believed that he was either

8    experiencing mental health crisis or potentially was under

9    the influence of narcotics.

10      Q.    What did you observe that gave you that

11    impression?

12      A.    His erratic behavior, his incoherent speech, his --

13    obviously he had harmed himself with the knife that he was

14    holding, and also threatening self harm.

15      Q.    When you say erratic behavior, what exactly are you

16    referring to?

17      A.    Just generally outlook of panic, pacing back and

18    forth, speaking rapidly.

19      Q.    And when you say incoherent speech, did you feel

20    like Jordan was slurring his words at any point?

21      A.    No.  Just more speaking, phrases that potentially

22    didn't make too much sense or inaudible to me.

23      Q.    Okay.  Can you give me an example of a phrase you

24    heard him speak that were incoherent to you?

25      A.    Nothing in particular comes to mind.

```
 1                        CERTIFICATE

 2                            OF

 3          CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5          I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8          That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10          That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12          That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15          Further, that the foregoing is an accurate

16   transcription thereof.

17          I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21          IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  November 18, 2022.

23                        _____

24                        Jinna Grace Kim, CSR No. 14151

25
```

# Exhibit C

```
 1               UNITED STATES DISTRICT COURT

 2               EASTERN DISTRICT OF CALIFORNIA

 3

 4   MARY ELLEN LENNOX, individually and   )
     as successor in interest to decedent  )
 5   Jordan Zenka,                         )
                                           )
 6                    Plaintiff,           )
                                           )
 7                    vs.                  ) Case No.
                                           ) 2:21-CV-02075-TLN-KJN
 8   CITY OF SACRAMENTO; STATE OF          )
     CALIFORNIA; MICHAEL PINOLA; ROBERT    )
 9   LINDER; MICHAEL G. SIMPSON; TRAVIS    )
     HUNKAPILLER; RUVMIN TSVEROV; ANGEL    )
10   ESPINOZA; JOSEPH SWALEH; JASON        )
     FINNECUM; JOHN HELMICH; and DOES 9-10,)
11   inclusive,                           )
                                           )
12                    Defendants.          )
     _____)
13

14

15

16          REMOTE VIDEOCONFERENCE DEPOSITION OF

17                    ROBERT LINDNER

18             WEDNESDAY, NOVEMBER 16, 2022

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  427229
```

1    A.    Yes.

2    **Q.    Did you know who those officers were?**

3    A.    I think the only one I recall was I think Officer

4    Gray who was doing the verbal communication.

5    **Q.    Did you observe the suspect in the store at some**

6    **point?**

7    A.    Yes.

8    **Q.    Did you ever learn what his name was?**

9    A.    No.

10    **Q.    Do you know today what his name is?**

11    A.    I think it's on some of the paperwork, but I didn't

12    pay attention to it.

13    **Q.    Okay.  And when you first observed him, the suspect,**

14    **what did you see?**

15    A.    He was armed with a knife, looked like a bread

16    knife, a serrated, had a serrated blade on it.  I don't

17    believe it had a sharpened tip, but it was serrated, so I

18    knew it was sharp.  I recall the blade length being 12 inches

19    long with a black handle.  And he would have that knife, you

20    know, to his throat, to the side of his neck, you know,

21    sometimes he, you know, put his arms down and just hold it,

22    but the whole entire time that I had visual contact with him,

23    he was always holding that knife.  I never saw him put it

24    down.

25    **Q.    And at that point would you say that based on your**

1    training and experience, did you believe that he was

2    experiencing a mental health crisis?

3         A.    To me it looked like he was under the influence of

4    possibly methamphetamine and was also may or may not been

5    experiencing a mental health crisis.

6         Q.    And how far were you from the suspect when you first

7    observed him?

8         A.    So I was with all the other officers at the

9    self-checkout, and he was in the produce section.  So and he

10   would be moving around, so I don't know.

11        Q.    Do you have any approximation?

12        A.    50 feet, approximately.

13        Q.    So you arrived, and you observed Officer Gray

14   speaking with him.

15             What, if anything, do you recall with regards to

16   their conversation?

17        A.    So it was more than just, you know, drop the knife,

18   put the knife down, drop the knife.  It was actually I

19   thought he was doing a great job using, you know, crisis

20   negotiation techniques in talking to, you know, the man with

21   a knife, you know, trying to develop a rapport with him.

22             You know, I remember him asking, Officer gray asking

23   him his name, and saying, you know, my name is Officer Gray,

24   and, you know, how can we help you, and, you know, throughout

25   all that was, you know, do me a favor and I need you to put

```
 1                        CERTIFICATE

 2                            OF

 3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5            I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6    Stenographic Shorthand Reporter of the State of California,

 7    do hereby certify:

 8            That the foregoing proceedings were taken before me

 9    at the time and place herein set forth;

10            That any witnesses in the foregoing proceedings,

11    prior to testifying, were placed under oath;

12            That a verbatim record of the proceedings was made

13    by me, using machine shorthand, which was thereafter

14    transcribed under my direction;

15            Further, that the foregoing is an accurate

16    transcription thereof.

17            I further certify that I am neither financially

18    interested in the action, nor a relative or employee of any

19    attorney of any of the parties.

20

21            IN WITNESS WHEREOF, I have subscribed my name, this

22    date:  November 16, 2022.

23

24    _____
      Jinna Grace Kim, CSR No. 14151

25
```

# Exhibit D

Transcript of the Testimony of:

## MARY ELLEN LENNOX

LENNOX

vs.

CITY OF SACRAMENTO, et al.

February 9, 2023

Volume I



1      A    No.

2      Q    Do you have that anywhere in either your phone book,

3  cell phone, email, anything of that nature?

4      A    No.

5      Q    If you need to get in touch with George, would you be

6  able to?

7      A    Yes.

8      Q    And how would you be able to get in touch with him?

9      A    I have his phone number.

10     Q    Do you know that phone number by memory?

11     A    No.

12     Q    How long had Jordan been in Sacramento before

13  December 13, 2020?

14     A    I don't know exactly.  I estimate about six weeks.

15     Q    And during that six-week period was he living with

16  George Cardenas the entire time as far as you know?

17     A    As far as I know, yes.

18     Q    Before that six-week period where was Jordan living?

19     A    I don't know.

20     Q    When was the last time Jordan lived with you in your

21  home in Sherwood, Oregon?

22     A    It was somewhere during -- I'm sorry, I'm a little

23  nervous, September 2020.  I don't know the exact date that he

24  moved out.

25     Q    Did he voluntarily move out of your home or was he

1    asked to leave?

2        A    He was asked to leave.

3        Q    And who asked him to leave?

4        A    I asked him to leave.

5        Q    Without getting into too much detail, can you tell me

6    why it is that you asked Jordan to leave in September of 2020?

7        A    Jordan had a problem with his alcohol use and we had,

8    I had an arrangement that he was always welcome in my home as

9    long as he wasn't using alcohol.

10       Q    Other than alcohol, did you know whether he was using

11   any other kinds of substance?

12       A    I didn't.  Well, perhaps on occasion, perhaps some

13   marijuana.  I had no other knowledge.

14       Q    Did you suspect that Jordan was using any other

15   substance other than alcohol and marijuana?

16       A    No.

17       Q    After Jordan moved out of your home in September of

18   2020, do you know where he went before he started living with

19   George Cardenas?

20       A    I don't know.  I do know occasionally if he had enough

21   money, he would live at a low cost motel.

22       Q    Do you know if he was working during the time that he

23   left your home in September 2020 to the time he started living

24   with George Cardenas?

25       A    I don't know.

1    Q    Okay.  So these problems that he had with alcohol, I

2    mean you described it as he drank too much, I believe.  Were

3    there things, like would it affect his behavior or his

4    relationship with you or others or with keeping down a job?

5    How would the alcohol problems, how would they manifest

6    themselves in your eyes?

7            MS. BAGDASSARIAN:  Objection, compound, vague.  Calls

8    for speculation.  Assumes facts not in evidence.  Misstates the

9    testimony.

10           MR. RICHMOND:

11    Q    Please answer.

12    A    I believe it affected his ability to stay employed.

13    And it affected me in the way that to live in my home he needed

14    to live a sober life.

15    Q    Other than affecting him being able to hold down

16    employment, were there other -- did it interfere with your

17    relationship with him?

18           MS. BAGDASSARIAN:  Objection, vague.  You can answer

19    if you understand the question.

20           THE WITNESS:  We always loved each other.  No matter

21    what happened we always stayed connected at the heart.

22           MR. RICHMOND:

23    Q    And I absolutely appreciate that, Ms. Lennox, but did

24    his alcohol use, did it interfere with the relationship that

25    you had with him?

1        MS. BAGDASSARIAN:  Same objection.  Asked and

2   answered.

3        MR. RICHMOND:

4   Q    Please answer.

5   A    It interfered with the ability to live together in the

6   same home.  It didn't interfere with how we loved each other

7   because we stayed connected.  When he was sober, he was always

8   welcome in my home, and even when he wasn't living with me, he

9   was back frequently as long as -- he came back for dinner or to

10  help me with something, as long as he entered my home sober.

11  Q    So it interfered with the ability to live in your home

12  but how did it do that?

13       MS. BAGDASSARIAN:  Objection, vague.  Objection asked

14  and answered.  You can answer if you understand the question.

15       THE WITNESS:  It, as I understand the question, I

16  believe I have answered it.  It did so because in my home I

17  want to live with my children who are leading a sober life.

18       MR. RICHMOND:

19  Q    So it was just a rule that you had that in order to be

20  or live in your home you must be sober; is that correct?  If I

21  understood you correctly.

22  A    Correct.

23  Q    And you also mentioned a period before that he left to

24  live in Sacramento for a period of years where he would be

25  living in the home, that he would move out and then maybe go

1  | STATE OF CALIFORNIA     )
                            )  ss.
2  | SACRAMENTO COUNTY       )

3          I, AMY JO TREVINO, a Certified Court Reporter in and

4  for Sacramento County, State of California, do hereby certify;

5          That on Thursday, February 9, 2023, at the hour of 1:30

6  P.M. of said day, through audio visual transmission appeared

7  MARY ELLEN LENNOX, who was duly sworn by me to testify the

8  truth, the whole truth and nothing but the truth, and thereupon

9  was deposed in the matter entitled herein;

10         That said deposition was taken in verbatim stenotype

11 notes by me and thereafter transcribed into typewriting as

12 herein appears;

13         That the foregoing transcript, consisting of pages 1

14 through 73, is a full, true and correct transcription of my

15 stenotype notes of said deposition.

16         DATED:  This 16th day of February 2023.

17

18

19         AMY JO TREVINO, CSR #5296

20

21

22

23

24

25