LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Renee V. Masongsong, Esq. (SBN 281819)
rvalentine@galipolaw.com
Benjamin S. Levine, Esq. (SBN 342060)
blevine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA  91367
Telephone:	(818) 347-3333
Facsimile:	(818) 347-4118

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY ELLEN LENNOX, individually and as successor in interest to decedent Jordan Zenka,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>STATE OF CALIFORNIA, et al.,<br><br>　　　　　　Defendants. | Case No. 2:21-cv-02075-DAD-CSK<br><br>**PLAINTIFF'S TRIAL BRIEF**<br><br>Trial Date:　February 18, 2025<br>Time:　　　 9:00 a.m.<br>Courtroom:　4<br>Judge:　　　Hon. Dale A. Drozd |

**TRIAL BRIEF**

**I.   STATEMENT OF FACTS**

In the morning on December 13, 2020, Decedent Jordan Zenka was experiencing an apparent mental health crisis. Sacramento Police Department ("SPD") officers received information that Zenka had driven his car into a wall of a grocery store, ran inside while yelling that someone was trying to kill him, took a bread knife from the bakery, and began cutting his own neck. SPD officers Michael Pinola (with his K-9 police dog), Ruvim Tsverov, Joseph Swaleh, Robert Lindner, Angel Espinoza, Jason Finnicum, and John Helmich, and California Highway Patrol officer Michael Simpson began to arrive and congregated by the self-checkout stands. The officers observed Zenka, who appeared afraid, standing in the produce section with blood running down his neck while holding a bread knife with a rounded tip, and saw him hold the knife against his neck or arms and cut himself. Officers noted this was abnormal behavior and believed he was having a mental health crisis. Officers had no prior information about Zenka (including information regarding whether he had a criminal record or had ever previously used drugs or alcohol) or information he was under the influence, and nobody other than Zenka was injured. Tsverov began speaking to Zenka after taking over from the first responding officer.

SPD Sergeant Travis Hunkapiller arrived at the store, assumed responsibility for coordinating a response to Zenka, and immediately formulated a tactical plan under which a "contact team" of some of the officers—including Officers Helmich and Finnicum, each armed with 40mm launchers—would approach Zenka with shields and use "overwhelming less-lethal" force to attempt to subdue him and take him into custody. Some officers remained near the self-checkout stands as the contact team formed just to their south, and officers from these groups aimed their weapons at Zenka. At Hunkapiller's direction, additional officers, including Lindner and Swaleh, took positions down the aisles to the south of Zenka. Simpson, Pinola, and the police dog stood by the northwest exit to the store, the nearest exit to Zenka. Hunkapiller directed Pinola to release the dog if Zenka attempted to flee, but only if Zenka first dropped the bread knife.

Officers were concerned that Zenka might attempt to escape the store and, based on their

experience and training, understood or should have known that firing less-lethal weapons at a suspect—especially one experiencing a mental health crisis—could cause him to run. Despite these concerns, there was no discussion of what officers should do if Zenka started to run toward the exit in response to the contact team's advance or use of less-lethal weapons, nor any discussion regarding Pinola and Simpson maintaining a safe distance or utilizing cover in the event Zenka ran in their direction. Pinola and Simpson drew their firearms.

By this time, officers understood that all civilians other than Zenka had been cleared out of the store. After the contact team was assembled, officers positioned to the south of Zenka began moving toward him up multiple aisles, with their weapons pointed at him. The presence of these officers made him visibly nervous and agitated, and Zenka repeatedly looked behind him toward these officers.

The contact team began to advance toward Zenka, who had remained standing in the produce area the entire time the defendants were on scene. Officers acknowledged that at this time, Zenka did not appear to pose an immediate threat of death or serious bodily harm to anyone else, and thus deadly force would have been inappropriate. As the contact team advanced, Simpson and Pinola also began moving forward, away from the exit doors to the west and south and closer to Zenka and choking off his potential path of escape, despite nobody having told them to. Immediately after the contact team began advancing, officers in the contact team and to Zenka's south began firing less-lethal weapons at him. After the officers started firing these weapons at Zenka, he began to quickly move northward toward a wall running west to east, directly away from the officers approaching and firing at him from his south. Upon reaching the wall, Zenka turned right and moved eastward along the wall until reaching a corner joining that wall with another that ran south to north, toward the northwest exit, while holding the bread knife with the handle at approximately navel level, with the blade pointed down. Once Zenka began moving, his movement was always directed toward the northwest exit, and less-lethal rounds struck him all over his body.

As Zenka was just south of the corner, holding the bread knife in the same position, Tsverov deployed his Taser at and struck Zenka, electrocuting him for five seconds. As he was

struck, Zenka turned to his left, exposing his back and right flank to Simpson and Pinola. The Taser was effective and caused his body to seize up and fall to the ground, with his arm downward with the bread knife by his hip or thigh. Once Zenka's body seized up from the Taser, without issuing any commands or verbal warning, Pinola and Simpson began firing four and six shots, respectively, at Zenka from approximately 10-15 feet away, striking him seven times. When the officers fired all or some of these shots, Zenka was already falling onto the ground, with the final shots fired after Zenka was on his back. At no point during these shots was Zenka moving toward the officers. Zenka never verbally threatened to harm anyone, injured anyone else, attempted to strike or harm anyone while the defendants were on the scene, made any stabbing or slashing motions toward anyone other than himself, raised the bread knife above his head, or came within striking distance of any officer, and he did not have a gun.

After Zenka had fallen, officers could tell he had been shot. Officers used additional less-lethal against Zenka after he had been shot and was lying on the ground. Zenka died of his injuries.

**II.    ISSUES OF LAW**

Following this Court's Order on Summary Judgment, [Dkt. 61] this Court's Order dismissing certain claims pursuant to a stipulation by and among the parties [Dkt. 63], and the recent stipulated dismissal of the City of Sacramento Defendants, Plaintiff maintains the following claims set forth in her Second Amended Complaint [Dkt. 21], the operative complaint in this case:

1. Fourth Amendment—Excessive Force (42 U.S.C. § 1983), against Defendant Simpson;
3. Fourteenth Amendment—Substantive Due Process/Interference with Familial Relationship (42 U.S.C. § 1983), against Defendant Simpson;
7. Battery (Wrongful Death and Survival), against Defendants Simpson and State of California;
8. Negligence (Wrongful Death and Survival), against Defendants Simpson and State of California;

9. Bane Act (Cal. Civ. Code § 52.1), against Defendants Simpson and State of California.

Defendants have also asserted affirmative defenses of qualified immunity against Plaintiff's § 1983 claims and immunity under California law against Plaintiff's state law claims. [*See* Dkt. 78 at 9.]

### III. POINTS OF LAW

#### A. Fourth Amendment—Excessive Force

"Fourth Amendment claims of excessive force are analyzed under an objective reasonableness standard." *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010). When evaluating a claim of excessive force, the inquiry is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them. *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Accordingly, facts of which officers were unaware "are irrelevant to the reasonableness analysis." *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1123 n.4 (9th Cir. 2021); *see Glenn*, 673 F.3d at 873 n.8 ("We cannot consider evidence of which the officers were unaware—the prohibition against evaluating officers' actions 'with the 20/20 vision of hindsight' cuts both ways."). "[The reasonableness] inquiry requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake." *Glenn*, 673 F.3d at 871 (quoting *Graham*, 490 U.S. at 396). "[T]he amount of force applied" must be balanced "against the need for that force." *Bryan v. McPherson*, 630 F.3d 805, 823-24 (9th Cir. 2010) (cleaned up). "[A]ll force—lethal and non-lethal—must be justified by the need for the specific level of force employed." *Id.* at 825.

"The intrusiveness of a seizure by means of deadly force is unmatched," *Graham*, 490 U.S. at 397, "because, once deceased, an individual can no longer stand trial to have his guilt and punishment determined." *Estate of Aguirre v. County of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022) (cleaned up) (citing *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). Government interest factors to balance against the type of force used include "(1) the severity of the crime at issue,

(2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Additional factors to consider are (4) "whether proper warnings were given" that force would be used if the suspect did not comply, (5) "the availability of less intrusive" options to effectuate arrest, and (6) "whether the suspect has exhibited signs of mental illness." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1033-34 & n.9 (9th Cir. 2018); *see S.R. Nehad v. Browder*, 929 F.3d 1125, 1137-38 (9th Cir. 2019).

"[Ninth Circuit] precedent has long made clear that the suspect's possession of a weapon at some point in the incident does not provide an officer with carte blanche to use deadly force." *Lam v. City of Los Banos*, 976 F.3d 986, 1001 (9th Cir. 2020). An officer's "desire to resolve quickly a potentially dangerous situation" does not, on its own, justify the use of deadly force. *Deorle*, 272 F.3d at 1281. Additionally, "law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997). Thus, deadly force is justified only if the shooting officer reasonably "perceived an immediate threat of death or serious physical injury at the time he shot." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014) (en banc).

Here, the totality of the circumstances does not support the contention that Zenka posed an immediate threat of death or serious bodily injury at the time that Simpson used lethal force. Zenka gave every indication that he was in the throes of a mental health or emotional crisis, given that he had been using a bread knife to cut his own neck and arms and given that he appeared scared and alarmed and was largely nonverbal throughout the encounter. At the time the initial less-lethal force was used, Zenka was standing in the same area of the produce section that he had been standing in for approximately 20 minutes, had given no indication of any intention to injure anyone other than himself, had committed no crime, and was not attempting to flee. No verbal warning was given before any force was used against Zenka, including lethal force. And no reasonable officer would have believed Zenka posed an immediate threat of death or serious bodily injury at the time Simpson fired, given that Zenka was only moving in response to having less-lethal weapons fired at him without warning, had been successfully subdued by the Taser, was not

facing Simpson, and had not raised the bread knife.

### B. Fourteenth Amendment—Substantive Due Process/Interference with Familial Relationship

The standard for whether official action amounts to a due process violation under the Fourteenth Amendment is whether the conduct "shocks the conscience." *Hayes v. County of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013). "Where actual deliberation is practical" before an officer uses force, only a showing of "deliberate indifference" is required. *Id.* The deliberate indifference standard applies where officers have the opportunity to evaluate the potential threat posed by a suspect, *see Willis v. City of Fresno*, 520 F. App'x 590, 592 (9th Cir. 2013); *Kaur v. City of Lodi*, 263 F. Supp. 3d 947, 972 (E.D. Cal. 2017) (deliberate indifference standard applied to suspect who at time of shooting "was neither dangerous nor currently in flight"); *Kosakoff v. City of San Diego*, 2010 WL 1759455, at *11-12 (S.D. Cal. Apr. 29, 2010), or where officers use force following a standoff during which there is time to create and implement a tactical plan, *Ewolski v. City of Brunswick*, 287 F.3d 492, 511 (6th Cir. 2002); *Alford v. Humboldt Cnty.*, 785 F. Supp. 2d 867, 881 (N.D. Cal. 2011). Conversely, in situations "that escalate so quickly that the officer must make a snap judgment" and there is no time to deliberate, a plaintiff must show that the officer acted "with a purpose to harm unrelated to legitimate law enforcement objectives." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). The "snap judgment" to use deadly force must be a reaction to an *unforeseen* escalation by the subject. *See Hayes*, 736 F.3d at 1130 (officer's decision to use deadly force was "sudden" and a "snap judgment based on the unexpected appearance of a knife in [decedent's] hand").

Here, the use of deadly force also was not in response to an unforeseen escalation by Zenka, as Simpson anticipated that Zenka would attempt to flee the store in response to less-lethal weapons being fired at him, so the "deliberate indifference" standard applies. Under these circumstances, the use of deadly force amounted to deliberate indifference.

### C. Battery

Under California law, a battery claim arising out of excessive force by a peace officer is evaluated by way of traditional Fourth Amendment analysis under *Graham*. *See Munoz v. City of*

1  *Union City*, 120 Cal. App. 4th 1077 (2004), *disapproved of on other grounds by Hayes v. Cnty. of*
2  *San Diego*, 57 Cal.4th 622, 639 & n.1 (2013). Additionally, pursuant to Penal Code section 835a,
3  "a peace officer is justified in using deadly force only when the officer reasonably believes, based
4  on the totality of the circumstances, that such force is necessary . . . [t]o defend an imminent threat
5  of death or serious bodily injury." Cal. Pen. Code § 835a(c). "A threat of death or serious bodily
6  injury is "imminent" when, based on the totality of the circumstances, a reasonable officer in the
7  same situation would believe that a person has the present ability, opportunity, and apparent intent
8  to immediately cause death or serious bodily injury to the peace officer or another person." *Id.*
9  § 835a(e)(2). For the reasons explained above, and because the circumstances at the time deadly
10 force was used did not indicate Zenka had the "present ability, opportunity, and apparent intent to
11 immediately cause death or serious bodily injury" to Simpson, this standard is satisfied in this case.

    D.  <u>Negligence</u>

"California negligence law regarding the use of deadly force overall is broader than federal Fourth Amendment law." *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125 (9th Cir. 2021) (citing *Villegas ex rel. C.V. v. City of Anaheim*, 828 F.3d 1252, 1257 n.6 (9th Cir. 2016)) (internal quotation marks omitted). While California law generally considers federal Fourth Amendment factors when assessing an officer's tactical conduct at the time of the challenged use of force, California negligence also encompasses tactics and decisions leading up to that use of force. *Id.* at 1125, 1126. "Under California law, the officer's pre-shooting decisions can render his behavior unreasonable under the totality of the circumstances, even if his use of [] force at the moment . . . might be reasonable in isolation." *Id.* at 1125.

As explained above, even under the narrower Fourth Amendment standard, Simpson's use of deadly force against Zenka was unreasonable. Consideration of Simpson's tactics and decisions prior to his use of deadly force renders the force further unreasonable, given that he failed to account for the anticipated possibility that Zenka would attempt to move toward the exit doors, and given that Simpson unreasonably advanced toward Zenka despite not having been told to do so.

    E.  <u>Bane Act</u>

The Bane Act "provides a cause of action for violations of a plaintiff's state or federal civil

rights committed by 'threats, intimidation, or coercion,'" *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (citation omitted), which need not be independent from the "coercion" inherent in the underlying civil rights violation itself. *B.B. v. Cnty. of Los Angeles*, 25 Cal. App. 5th 115, 129-33 (2018), *rev'd on other grounds by B.B. v. Cnty. of Los Angeles*, 10 Cal. 5th 1 (2020). Thus, beyond showing a civil rights violation, a plaintiff must only show the defendant acted with specific intent to violate a decedent's civil rights. *See B.B. v. Cnty. of Los Angeles*, 25 Cal. App. 5th 115, 129-33 (2018), *rev'd on other grounds*, 10 Cal. 5th 1 (2020); *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018). A "reckless disregard for a person's constitutional rights is evidence of specific intent to deprive that person of those rights." *Reese*, 888 F.3d at 1045. Given Simpson's reckless conduct in this case, this standard is satisfied here.

F. <u>Qualified Immunity</u>

Qualified immunity does not apply where an official's conduct "violate[s] clearly established . . . constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79 (2017). The touchstone of the "clearly established" inquiry is whether "officers [had] fair notice of the illegality of their conduct" at the time. *Orn v. City of Tacoma*, 949 F.3d 1167, 1178 (9th Cir. 2020) (citing *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)); *see Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002). Although this ordinarily requires "cases relevant to the situation [officers] confronted," *Brosseau*, 543 U.S. at 200, it does "not require a case directly on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see Hope*, 536 U.S. at 740 (qualified immunity should be denied even "despite notable factual distinctions between the precedents relied on and the [instant case], so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights").

Here, as this Court has already recognized, the facts viewed in the light most favorable to Plaintiff sufficiently align this case with previous cases in which officers' use of deadly force was found to be excessive, including *Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018), *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011), and *Zion v. County of Orange*, 874 F.3d 1072 (9th Cir. 2017). (Order on Summary Judgment at 37-39 [Dkt. 61]; *see also* Order Denying Reconsideration at 5-9 [Dkt. 80].)

-8-
PLAINTIFF'S TRIAL BRIEF

G. Statutory Immunity

"Immunity is reserved for those '*basic policy decisions* [which have] been [expressly] committed to coordinate branches of government, and as to which judicial inference would thus be 'unseemly.'" *Gillan v. City of San Marino*, 147 Cal.App.4th 1033, 1051 (2007) (quoting *Johnson v. State of California*, 69 Cal. 2d 782, 293 (1968)). A police officer's decision to detain or arrest a suspect is "not a basic policy decision, but only an operational decision by the police purporting to apply the law." *Id.* California law denies immunity to police officers who use excessive force in arresting a suspect. *See Nelson v. City of Davis*, 685 F.3d 867, 875 (9th Cir. 2012); *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1016 (9th Cir. 2002); *Blankenhorn v. City of Orange*, 485 F.3d 463, 487 (9th Cir. 2007); *Scruggs v. Haynes*, 252 Cal.App.2d 256, 264 (1967). Because Plaintiff's claim arises out of Simpson's use of force during a detention/arrest, which was not a policy decision, Simpson is not entitled to immunity under section 820.2. Because Simpson is not immune under California law, the State of California also is not immune under Government Code section 815.2.

Penal Code § 835a provides that "peace officers are privileged under state law to use reasonable force effect the arrest, to prevent escape or to overcome resistance." The operative language is clear: The privilege applies only to the use of "reasonable" force," not to "unreasonable" force. *See also Hernandez v. City of Pomona*, 46 Cal.4th 501 (2009) (same). A peace officer is never privileged to use excessive force. *See Scruggs*, 252 Cal.App.2d at 267-68.

IV. **CONCLUSION**

Plaintiff respectfully submits this Trial Brief for the Court's consideration in anticipation of the upcoming trial.

Dated: February 14, 2025                LAW OFFICES OF DALE K. GALIPO

                                        By:    */s/ Dale K. Galipo*
                                               Dale K. Galipo
                                               Renee V. Masongsong
                                               Benjamin S. Levine
                                               Attorneys for Plaintiff